**Case No. 22-11232-AA**

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

THEODORE H. FRANK,

Objector-Appellant,

v.

DAVID WILLIAMS, *et al.*,

Plaintiffs-Appellees,

RECKITT BENCKISER, LLC and
RB HEALTH (US) LLC,

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Florida

No.   1:20-cv-23564-MGC

## ANSWER BRIEF OF APPELLEES DAVID WILLIAMS, CAROLL ANGLADE, THOMAS MATTHEWS, MARTIZA ANGELES, AND HOWARD CLARK

Martha A. Geer
Mark R. Sigmon
Patrick M. Wallace
Milberg Coleman Bryson
Phillips Grossman, PLLC
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5000
mgeer@milberg.com
msigmon@milberg.com
pwallace@milberg.com

*Attorneys for Plaintiffs-Appellees*

**No. 22-11232-AA**
**Theodore H. Frank v. David Williams, *et al.***

## <u>CERTIFICATE OF INTERESTED PERSONS</u>
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

Plaintiffs-Appellees certify and do not believe that persons or entities have been omitted from the CIP contained in the first brief filed.

<u>      /s/ Martha A. Geer      </u>
Martha A. Geer
Mark R. Sigmon
Patrick M. Wallace
Milberg Coleman Bryson
Phillips Grossman, PLLC
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5000
mgeer@milberg.com
msigmon@milberg.com
pwallace@milberg.com

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs believe that the law applicable to this appeal is well established and recognized by district courts throughout this Circuit. Because, however, Appellant seeks to override the existing Eleventh Circuit precedent and asserts, as a basis for oral argument, that the issues on appeal "pit the district court's decision against the plain text of the Rule *and the decisions of other Circuits*" (emphasis added), Plaintiffs would respectfully request an opportunity to present oral argument regarding why this Circuit's existing authority remains controlling. In addition, this case addresses issues of Article III standing under recent Supreme Court and Eleventh Circuit precedent that warrant oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................ i

STATEMENT REGARDING ORAL ARGUMENT .................................. ii

TABLE OF CONTENTS ................................................................... iii

TABLE OF CITATIONS ................................................................. vi

PRELIMINARY STATEMENT .......................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATEMENT OF THE ISSUES ON APPEAL ....................................... 3

STATEMENT OF THE CASE .......................................................... 4

    I.    BACKGROUND OF THE LITIGATION AND MEDIATION ............................................................... 4

        A.    Plaintiffs' Presuit Investigation ........................... 4

        B.  The Course of the Neuriva Litigation. .................... 7

        C.    Mediation and Settlement Efforts ....................... 12

        D.    The Terms of the Settlement. ............................ 15

            1.    Monetary Relief ...................................... 16

            2.    Injunctive Relief ..................................... 16

            3.    Attorneys' Fees and Expenses ..................... 18

            4.    Notice and Settlement Administration ........... 18

            5.    The Judicial Review of the Settlement ........... 20

SUMMARY OF THE ARGUMENT ......................................... 25

STANDARD OF REVIEW ..................................................... 26

ARGUMENT ......................................................................... 27

    I.    MR. FRANK LACKS ARTICLE III STANDING AND,
           THEREFORE, THIS COURT LACKS JURISDICTION
           OVER HIS APPEAL. ................................................ 27

    II.   THE DISTRICT COURT PROPERLY APPLIED
           CONTROLLING ELEVENTH CIRCUIT STANDARDS
           FOR REVIEW OF CLASS ACTION SETTLEMENTS. ........... 34

           A.   The District Court made Adequate Findings to Meet
                the Requirements of Rule 23(e)(2)(C)(ii) and (iii). ............ 36

           B.   The 2018 Amendments did not Change Controlling
                Eleventh Circuit Law and the District Court's
                Decision is a Mainstream Application of that Law. ........ 41

           C.   Other Circuits have Adopted the Same Constructive
                Common Fund Analysis as the Eleventh Circuit. ............ 48

           D.   Mr. Frank's Claim that the Attorneys' Fee Amounts
                to a Disproportionate Allocation as a Matter of Law
                is Contrary to Eleventh Circuit Authority. ....................... 55

           E.   Mr. Frank did not Preserve any Argument Below
                Related to the "Method of Distribution" under Rule
                23(e)(2)(C)(ii). ...................................................................... 61

    III.  THE INJUNCTIVE RELIEF IS A PROPER AND
           VALUABLE ASPECT OF THE SETTLEMENT. ..................... 63

CONCLUSION ..................................................................... 66

CERTIFICATE OF COMPLIANCE ......................................................... 68

CERTIFICATE OF SERVICE.................................................................. 68

# TABLE OF CITATIONS

## CASES

*In re Baby Prod. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013).........46, 63

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) ................27, 34

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .................................................................................57, 60

**Boeing v. Van Gamert*, 444 U.S. 472 (1980) ...............................*passim*

*Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) ..........52, 53, 54, 61

*Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) ................................................................................41, 46

*Carter v. Forjas Taurus, S.A.*, 701 Fed. Appx. 759 (11th Cir. June 29, 2017) .................................................................................42, 46

*Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L. Ed. 915 (1885) .........................................................44, 45

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018)..........65

*Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019) .................................................................................30

*Devlin v. Scardelletti*, 536 U.S. 1 (2002).................................................29

*Dewey v. Volkswagen Aktiengesellschaft*, 558 F. App'x 191 (3d Cir. 2014) .................................................................................49

**Drazen v. Pinto*, 41 F.4th 1354, 2022 WL 2963470 (11th Cir. 2022) ..............................................................................27, 28

*In re Dry Max Papers Litig.*, 724 F.3d 713 (6th Cir. 2013)....................59

vi

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir.), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021) ....................................................... *passim*

*Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579 (5th Cir. 2007) ........... 29

*Ferron v. Kraft Heinz Foods Co.*, No. 20-CV-62136-RAR, 2021 WL 2940240 (S.D. Fla. July 13, 2021).................................................... 48

*\*In re First Cap. Holdings Corp. Fin. Prod. Sec. Litig.*, 33 F.3d 29 (9th Cir. 1994) ................................................................... 29, 32, 33

*Frank v. Gaos,* ---, U.S. -- 139 S. Ct. 1041, 203 L. Ed. 2d 404 (2019) ..... 27

*Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269 (6th Cir. 2016) ............................................................... 49, 56, 57, 61

*\*In re Home Depot Inc.*, 931 F.3d 1065 (11th Cir. 2019) ... 41, 42, 43, 44, 48

*Johnson v. NPAS Sols., LLC*, 975 F.3d 1244 (11th Cir. 2020) ............... 45

*Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007) ................................................................................. 49

*In re Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094 (10th Cir. 2017) ........................................................................ 49, 53

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014)........................ 54, 55

*\*Poertner v. Gillette Co.*, 618 Fed. App'x 624 (11th Cir. 2015) ....... *passim*

*In re Samsung Top-Load Washing Machine Mktg., Sales Practices & Prods. Liab. Litig.*, 997 F.3d 1077 (10th Cir. 2021)... 52, 53, 54, 58

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) ............................................................... 28, 29

*TransUnion LLC v. Ramirez*, --- U.S. ----, 141 S. Ct. 2190, 2208 (2021) ................................................................................ 28. 29

*Trustees v. Greenough*, 105 U.S. 527, 26 L. Ed. 1157 (1882) ........... 44, 45

*United States v. Amodeo*, 916 F.3d 967 (11th Cir. 2019) ................. 27, 28

**\*Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) ...................................................................................... *passim*

*Watkins v. Spector*, 142 S. Ct. 765, 211 L. Ed. 2d 479 (2022) ................. 62

*Williams v. MGM-Pathe Communs. Co.*, 129 F.3d 1026 (9th Cir. 1997) ...................................................................................... 50, 53

*Williams v. McNeil*, 557 F.3d 1287 (11th Cir.2009) ............................... 39

*Wilson v. EverBank*, No. 14-CIV-22264, 2016 WL 457011 (S.D. Fla. Feb. 3, 2016) ............................................................................... 48

## STATUTES

Fla. Stat. § 501.201 *et seq* ........................................................................... 7

## OTHER AUTHORITIES

4 Newberg on Class Actions § 13.48 ................................................... 37, 52

4 William B. Rubenstein, Newberg on Class Actions § 13:7 (5th ed.2011) ............................................................................................... 46

Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, "Managing Class Action Litigation: A Pocket Guide for Judges," at 27 (3d Ed. 2010) ......................................................... 20

Fed. R. Civ. Pr. 23(e)(2) ....................................................................... *passim*

Manual Complex Lit. § 21.7 (4th ed. May 2022 Update) ......................... 50

N.Y. General Business Law § 349 ............................................................ 7

S.D. Fla. Local Magistrate Judge Rule 4(b) ............................................ 39

## PRELIMINARY STATEMENT

Beginning at least 23 years ago when this Court decided *Waters v. Int'l Precious metals Corp.*, 190 F.3d 1291 (11th Cir. 1999), and perhaps more accurately 42 years ago when the Supreme Court decided *Boeing v. Van Gamert*, 444 U.S. 472 (1980), the law of the Eleventh Circuit has been that an attorney who has created a fund for a class—even if it is a reversionary fund or a claims-made fund—is entitled to a percentage of that fund as attorneys' fees.  The size of the "fund" is not determined by what is ultimately paid out to class members, but rather by what attorneys through litigation and negotiation have been able to make available to the class—the opportunity that attorneys have created for the class members.

That principal, as adopted by the Eleventh Circuit, has now been applied repeatedly by the district courts throughout the Eleventh Circuit. It is also recognized across the country. Theodore Frank, the lone objector to the settlement below, urged the District Court to abandon these established principles—just as he has unsuccessfully urged courts in other circuits.

Although Mr. Frank also unsuccessfully made these same arguments to this Court previously in *Poertner v. Gillette Co.*, 618 F. App'x 624 (11th Cir. 2015), he now returns seeking a do-over, manufacturing a purported "change" in the law that no one else recognizes, and simply regurgitating the arguments that failed seven years ago.

Mr. Frank also invokes this Court's jurisdiction even though he has never claimed he was harmed as a result of his purchase of Defendants' product and will be fully reimbursed by the settlement. In short, he has suffered no injury for purposes of Article III standing.

Even if he had standing, no reason recognized by this Court exists to revisit the Magistrate Judge's thorough 108-page Report & Recommendation ("R&R"). It addresses all the factors mandated by this Court and the Federal Rules of Civil Procedure and was only entered after extensive and repeated briefing that extended over more than six months and a three-hour hearing. It should be no surprise that District Court Judge Marcia Cooke determined that the R&R was thorough and well-reasoned and adopted it as the decision of the Court. This Court need do no more than determine, consistent with the

standard of review, that the District Court did not abuse its discretion when finally approving the parties' settlement.

## JURISDICTIONAL STATEMENT

Because Mr. Frank has failed to establish that he has suffered a concrete injury, he lacks Article III standing, and this Court lacks jurisdiction over this appeal.

## STATEMENT OF THE ISSUES ON APPEAL

1.    Does appellant Theodore Frank have Article III standing to bring this appeal when (1) he never established at the trial level that he suffered a concrete harm as a result of purchasing one of Defendants' product, and (2) he no longer is suffering any injury since he will be fully reimbursed by the approved settlement for what he paid to buy Defendants' product?

2.    Did the District Court err when, in accordance with *Waters v. Int'l Precious metals Corp.*, 190 F.3d 1291 (11th Cir. 1999), it determined that the settlement gave rise to a constructive common fund composed of the amount the parties had agreed would be available for class members' claims ($8 million) plus the amount that the parties had agreed would be the maximum amount of attorneys' fees that Class Counsel could seek from the court ($2.9 million)?

3.    Did the District Court abuse its discretion when it determined that the settlement is fair, reasonable, and adequate under Rule 23(e)(2) of the Federal Rules of Civil Procedure and the Eleventh Circuit six-factor *Bennett* analysis?

4.    Did the District Court abuse its discretion when it approved a $2.9 million attorneys' fee award when the fee fell within the percentage of the constructive common fund that the Eleventh Circuit holds is reasonable?

## STATEMENT OF THE CASE

## I.    BACKGROUND OF THE LITIGATION AND MEDIATION.

### A. Plaintiffs' Pre-suit Investigation.

Defendants have marketed and sold a line of brain supplement products called "Neuriva" since only April 2019. Plaintiffs' class actions initially addressed Defendants' marketing claims regarding Neuriva Original and Neuriva Plus, but later added a third product, Neuriva De-Stress (collectively "Neuriva" or "Neuriva Products"). The central theme in all of Defendants' marketing and product labelling of the Neuriva Products is that they contain ingredients that have been clinically and scientifically "proven" to improve brain performance. D.E. 69-1 ¶ 5.

4

Prior to initiating this litigation, Class Counsel spent substantial time in pre-suit investigation, including conducting extensive research into the two active ingredients of Neuriva Original and Neuriva Plus: coffee cherry extract (branded "Neurofactor") and soy-based phosphatidylserine (branded "Sharp PS"). Counsel investigated the third-party suppliers of the ingredients, their relationship to Defendants, and the claims made by the suppliers. In addition, because the marketing claims would be central to any case against Defendants, Class Counsel did a comprehensive investigation into Defendants' marketing and advertising campaigns, including television commercials, in print, on their website, and on social media. Class Counsel also collected and reviewed not only the scientific and clinical studies cited in Defendants' marketing, but scores of other clinical and scientific studies relevant to Neuriva's ingredients and relevant to the falsity of Defendants' marketing claims that the ingredients were "clinically proven" to enhance brain performance. D.E. 69-1 ¶ 6.

In addition, Class Counsel retained and consulted a highly respected expert in neuroscience, pharmacology, and physiology regarding the state of the relevant scientific literature and biochemistry

mechanisms relevant to the Neuriva active ingredients. Class Counsel also retained a second equally well-regarded biostatistician to advise them on scientific test design and statistical analysis, especially with regard to studies performed on coffee cherry extract. D.E. 69-1 ¶ 7.

Once Class Counsel had progressed sufficiently with the pre-suit investigation, Counsel spent many hours interviewing consumers who had purchased Neuriva Products in order to identify strong candidates who would properly discharge their fiduciary duties as class representatives. Interviews with other consumers provided information regarding consumers' reactions to and reliance on the claims Defendants were making. D.E. 69-1 ¶ 8.

Class Counsel also carefully reviewed relevant state and federal law, including federal regulations and relevant FDA and FTC guidance regarding dietary supplements. Class Counsel further reviewed the filings and court decisions in similar litigation addressing comparable supplements in order to identify legal and factual issues likely to arise in the Neuriva litigation. Once Class Counsel had identified appropriate class representatives, Counsel then fully researched the law in California, Florida, and New York. D.E. 69-1 ¶ 9.

6

B.  The Course of the Neuriva Litigation.

On June 19, 2020, Plaintiff Thomas Matthews filed a class action in the Eastern District of California alleging claims on behalf of a California class under the California consumer protection statutes, on behalf of a multi-state class under multiple state consumer protection statutes, and on behalf of a nationwide class for unjust enrichment. D.E. 69-1 ¶ 10. Unfortunately, no judge was assigned to the *Matthews* case because of an "ongoing judicial emergency in the Eastern District of California." No. 1:20-CV-00854, D.E. 3-2 (June 22, 2020).

Plaintiffs David Williams and Caroll Anglade filed their class action complaint on August 26, 2020 in the Southern District of Florida, alleging claims under Fla. Stat. § 501.201 *et seq.* on behalf of a Florida class and for unjust enrichment on behalf of a nationwide class. D.E. 1. Plaintiff Martiza Angeles filed a class action complaint on September 2, 2020, in the Southern District of New York asserting claims on behalf of a New York class for violations of N.Y. General Business Law § 349 and for unjust enrichment. Plaintiff Howard Clark did not initially file suit but sent Defendants a pre-suit demand letter challenging Neuriva's marketing representations in May 2020. D.E. 69-1 ¶ 10.

Each of the lawsuits alleged that Defendants deceptively marketed and sold the brain supplement Neuriva as having ingredients—coffee cherry extract and phosphatidylserine—that were "clinically proven" and "proven" by science to improve brain performance in defined areas (for example, focus, memory, learning, accuracy, concentration, or reasoning). Plaintiffs alleged, among other things, that Neuriva's ingredients were not clinically or scientifically proven to improve brain performance; that as to some of the ingredients, Defendants' claims were biologically not possible; and that Defendants' claims overall were false or misleading. D.E. 69-1 ¶11.

Defendants first moved to dismiss the *Matthews* action, and, after counsel fully researched and investigated Defendants' motion to dismiss arguments, Plaintiff Matthews filed an Amended Complaint. D.E. 69-1 ¶ 13. In the *Williams* action, although the District Court had entered a case management order scheduling the case for trial in March 2022, Defendants moved to transfer the case to the Eastern District of California under the "first-filed" rule or, alternatively, to stay the *Williams* action pending proceedings in the *Matthews* case. D.E. 69-1 ¶ 14. Defendants also filed a motion to dismiss the *Williams* complaint.

D.E. 69-1 ¶ 13. The *Williams* Plaintiffs opposed Defendants' transfer motion and, after again fully researching and investigating Defendants' arguments under Florida and Eleventh Circuit law, filed an Amended Complaint in response to the motion to dismiss. *Id.*

Although Class Counsel believed the complaints in both *Matthews* and *Williams* could withstand the motions to dismiss, Counsel opted to strengthen their allegations by filing the amended complaints. Defendants, however, still moved to dismiss the *Williams* Amended Complaint. *Id.*

Although Defendants' deadline to respond to the *Angeles* case had not run by the time the Parties settled the case, Class Counsel assume that Defendants would have also filed a motion to stay or transfer in the *Angeles* case. D.E. 69-1 ¶ 14. Counsel believed that those motions, if allowed, would have very substantially delayed the cases from proceeding. Significantly, even though the *Matthews* case was filed in June 2020, no judge had been assigned to the case by the time the Parties notified the *Williams* Court in January 2021 that the case had been settled. D.E. 69-1 ¶ 14; No. 1:20-CV-00854 D.E. 3-2 (June 22, 2020). Ultimately, a judge was finally assigned for the first time in the *Matthews* case on January 7, 2022. *Id.* D.E. 56.

9

The *Matthews* and *Williams* actions originally made allegations concerning only Neuriva Original and Neuriva Plus but were subsequently amended to include Defendants' new product Neuriva De-Stress, which had identical labelling and marketing. In addition to coffee cherry extract, Neuriva De-Stress included a new active ingredient that Defendants called "French Melon Concentrate." Before adding Neuriva De-Stress to the lawsuits, Class Counsel consulted with their pharmacology/neuroscience expert regarding whether "clinical proof," as claimed by Defendants, existed that the new ingredient would in fact have the asserted effect on the brain. D.E. 69-1 ¶ 12.

Although Class Counsel felt confident in the merits of Plaintiffs' claims, they also were mindful of the significant hurdles they faced in reaching a successful adversarial resolution of Plaintiffs' claims. In the event litigation had continued, or were to continue, Defendants have maintained they would continue to seek a Rule 12(b) dismissal of Plaintiffs' claims and would aggressively oppose class certification and opposing the ability of Plaintiffs to represent purchasers of Neuriva Products that Plaintiffs had not purchased. D.E. 69-1 ¶ 16.

Class Counsel anticipated that if their motions for class certification were granted, Defendants would undoubtedly seek an

10

interlocutory appeal under Rule 23(f). The scope of discovery would likely have been hotly contested, and the case assuredly would have become a costly and time-consuming battle of experts. *Id.* Indeed, Defendants retained and submitted declarations from two well-credentialed experts to address issues arising in the course of the proceedings seeking final approval of the parties' settlement.

Had the cases continued, motion practice would have included not only motions for summary judgment but also *Daubert* motions by both Plaintiffs and Defendants. In all likelihood, any favorable result at trial would lead to lengthy appeals. D.E. 69-1 ¶ 16.

And, in the event that the *Williams* and *Angeles* cases were stayed or transferred pending decision in the *Matthews* case, much of this work would have been delayed until after January 2022. No. 1:20-CV-00854 D.E. 56. Class Counsel has always been mindful of the fact that, no matter their level of confidence about ultimately reaching a successful resolution of these cases, the false and misleading marketing campaign that prompted the litigation in the first place would continue unabated for years upon years absent a settlement. D.E. 69-1 ¶ 17.

C.     Mediation and Settlement Efforts

In the fall of 2020, Class Counsel, with the consent of Plaintiffs, decided to explore the possibility of a mediated settlement while Neuriva was a relatively new product and before the potential for harm and damages, the existence of which Defendants disputed, would drastically increase. The parties agreed to mediate the case on October 2, 2020, with Jill Sperber of Judicate West. Ms. Sperber is a well-respected mediator whose prior legal practice included litigating complex cases. Consequently, she is frequently asked to help resolve complex civil cases like this one. *See* https://www.judicatewest.com/adr/jill-sperber; D.E. 69-1 ¶¶ 18-19.

Prior to the October 2, 2020 mediation, Plaintiffs obtained, under Rule 408, informal discovery from Defendants regarding the claimed clinical and scientific bases for Defendants' labelling and marketing claims and regarding Neuriva's historical sales data. In preparation for the mediation, Class Counsel consulted with Plaintiffs' pharmacology/neuroscience expert regarding the studies Defendants provided as part of the informal discovery. Given Class Counsel's pre-suit and continuing factual and legal investigation together with the

12

informal discovery, Class Counsel was well-informed and prepared to formulate an appropriate demand and aggressively negotiate a reasonable resolution of the Class's claims. D.E. 69-1 ¶ 20.

The October 2, 2020 mediation lasted into the evening, with both parties hotly contesting: (a) the merits of each other's litigation positions; (b) what settlement structure to adopt; and (c) the scope of monetary and injunctive relief. The October 2 mediation ended without a settlement and without an agreement to engage in any future mediation or negotiations. D.E. 69-1 ¶ 21.

After the October 2 mediation, Ms. Sperber took the initiative to attempt to re-engage the parties in discussions about a potential resolution. With Ms. Sperber acting as an intermediary, the parties agreed to conduct a second mediation on November 30, 2020. The November 30 mediation also was hotly contested and again lasted into the evening, but the parties made significant progress towards a resolution regarding both monetary and injunctive relief. The parties finalized a term sheet incorporating the material terms agreed upon with the assistance of Ms. Sperber at the November 30 mediation. D.E. 69-1 ¶ 22.

After the November 30 mediation, the parties continued negotiations telephonically and were able to reach a final agreement regarding the remaining details related to the injunctive relief. In order to prevent Class Members and future purchasers of Neuriva Products from continuing to be exposed to claims that Neuriva ingredients are clinically or scientifically proven to improve brain performance, Class Counsel refused to settle without a change in Neuriva's labelling and marketing. The parties did not discuss attorneys' fees until after they had reached final agreement on the material terms for the Class. *Id.*

Thereafter, the parties continued to engage in discussions related to the finer details needed for a formal settlement agreement. They finalized the Settlement Agreement in January 2021. D.E. 69-1 ¶ 23.

The parties filed a notice of the settlement with the *Williams* court on January 7, 2021. D.E. 47. On January 20, 2021, in anticipation of filing the motion for preliminary approval of the settlement, Plaintiffs joined in filing a Consolidated Amended Complaint in the Southern District of Florida. D.E. 51. The Consolidated Amended Complaint involved the same factual claims regarding Defendants' false advertising of the three Neuriva Products

14

as set out in *Matthews*, *Williams*, and *Angeles* and included multiple claims made on behalf of consumers in California, Florida, and New York, as well as an unjust enrichment claim on behalf of a nationwide class.

On February 8, 2021, Plaintiffs filed their Motion for Preliminary Approval of the Proposed Settlement. D.E. 52. The District Court granted preliminary approval on April 23, 2021. D.E. 57.

D.    <u>The Terms of the Settlement.</u>

The Settlement provides relief to a Settlement Class defined as "[a]ll persons who purchased for personal consumption and not for resale, one or more of the Neuriva Products, from Reckitt or an authorized reseller, in the United States, between the dates of January 1, 2019, and the date of Preliminary Approval of the Settlement by the Court." (ECF No. 52-1, Ex. 1 ¶ I.Z). The time frame of the Class period began in January 2019 to capture when Defendants first began selling Neuriva Products.

The Settlement Agreement provided both monetary and injunctive relief to the Settlement Class.

15

### 1. Monetary Relief

The Defendants agreed to pay up to $8,000,000 in monetary relief to Settlement Class Members, *exclusive of* administrative costs, attorneys' fees and expenses, and court-ordered service awards, for purchases of Neuriva Products. Settlement Class Members with Proof of Purchase will receive up to $32.50 per valid claim, and Settlement Class Members may make up to two claims for a maximum of $65.00. For those without Proof of Purchase, Settlement Class Members will receive $5.00 per valid claim, and Settlement Class Members may make up to four claims for a maximum of $20.00. D.E. 116-1 ¶¶ IV.B.1-5.

### 2. Injunctive Relief

In addition to monetary relief, the Settlement Agreement also included proposed injunctive relief, which was subsequently modified by an Amended Settlement Agreement. D.E. 116. The injunctive relief is designed to address the main allegations of deceptive advertising raised in Plaintiffs' complaint by (1) barring Defendants from stating that the Neuriva Products or their ingredients are clinically or scientifically proven to improve brain performance, and (2) barring Defendants from using the terms "Clinically Tested and Shown," "clinical studies have shown" or similar "shown" claims. D.E. 116-1 ¶¶ IV.A.1(a)-(d).

The injunctive relief provision also allows *both* Plaintiffs and Defendants to seek relief from the Court should the state of the science change. Consequently, under the terms of the agreement, in the event that "new research, information, or regulatory or legal developments" arise that would warrant *expanding* the injunction to further restrict Defendants' marketing statements, *Plaintiffs* may seek modification of the injunction from this Court. D.E. 116-1 ¶ IV.A.4.

Defendants have six months after entry of the Final Approval Order and Judgment to correct all of their marketing (including label changes and internet and media advertising), and the agreed-upon changes will remain in effect for at least two years. D.E. 116-1 ¶ IV.A.3. At that point, if Defendants attempt to return to their current "Clinically Proven" and "Scientifically Proven" marketing campaign without additional scientific or clinical studies supporting their claims, they would again be subject to suit.

In exchange for the monetary and injunctive relief provided in the Settlement Agreement, members of the Settlement Class who did not timely and validly opt out of the Settlement Class will release and discharge the Settling Defendants from all claims as outlined in the Settlement Agreement. D.E. 116-1 ¶ VI.

17

3.    <u>Attorneys' Fees and Expenses.</u>

The Settlement Agreement provides that Class Counsel may make an application to this Court for an award of attorneys' fees and expenses in the amount not to exceed $2,900,000.00. Defendants' payment of fees and costs to Class Counsel is entirely separate and apart from the benefits provided to the Settlement Class and will have no impact on the recovery received by Settlement Class Members. D.E. 116-1 ¶ V.A-B.

The Parties negotiated and agreed upon attorneys' fees and costs only after agreeing on all material terms of the Settlement. In addition, the effectiveness of the Settlement and the releases is not contingent on the Court's approval of the Fee and Expense Award or affected by the amount of the Fee and Expense Award approved by the Court. D.E. 69-1 ¶¶ 47-48.

4.    <u>Notice and Settlement Administration.</u>

In granting the motion for preliminary approval, the District Court appointed the Angeion Group to act as the Settlement Administrator. The Settlement Administrator was responsible for, among other things: (a) initiating and monitoring the Notice Plan; (b)

establishing a Post Office box and a dedicated email address for receiving claims, requests for exclusions, objections, and other correspondence; (c) establishing a Settlement Website that will not only contain important documents and information on how to file a claim, but also be the means by which Settlement Class Members can electronically file claims; (d) forwarding inquiries to Class Counsel for a response, if warranted; (e) reviewing Claims in accordance with the Settlement Agreement; (f) otherwise implementing and/or assisting with the Claims review protocols agreed to by the Parties and set forth in the Settlement Agreement; and (g) processing payments on timely Valid Claims in accordance with the Settlement Agreement. D.E. 116-1 p. 4.

As detailed in the Declaration of Steven Weisbrot, a partner at Angeion, filed in support of the Motion for Preliminary Approval of the Settlement, D.E. 52-3, the Notice plan, which was approved by the Court, provided for notice through internet advertising (*id.* ¶¶ 16-27), a social media campaign using Facebook and Instagram (*id.* ¶¶ 28-30), a dedicated settlement website (*id.* ¶¶ 31-32), a paid search strategy designed to drive Class Members to the dedicated settlement website (*id.* ¶¶ 31-32), and a toll-free hotline (*id.* ¶ 34).

The notice plan was designed to reach 80.14% of the target audience with each person viewing the digital advertising an average of 3.99 times. (*Id.* ¶ 13). *See* Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, "Managing Class Action Litigation: A Pocket Guide for Judges," at 27 (3d Ed. 2010) (explaining that a publication notice plan that reaches 70% of class members is one that reaches a "high percentage" and is within the "norm").

Class Members could submit a claim online through the dedicated Settlement website or could obtain a paper claim form by calling a tollfree number or by requesting the form by mail from the Settlement Administrator. D.E. 116-1 ¶ IV.B.7. Class members also had until 45 days *after* Final Approval of the settlement in which to file their proofs of claim. D.E. 116-1 p. 3.

Ultimately, no Class Members requested to opt out and only one— Mr. Frank—filed an objection to the settlement. D.E. 133 p. 53. Truth in Advertising, a non-profit public interest law firm, was granted leave to file an amicus brief opposing the settlement with no objection by Plaintiffs. D.E. 79.

### 5.    The Judicial Review of the Settlement.

On April 26, 2021, the Magistrate Judge entered an order

directing the parties to provide additional information regarding the effectiveness of the proposed injunctive relief set out in the Settlement Agreement. D.E. 58. Plaintiffs and Defendants filed separate briefs responding to the Court's order on May 24, 2021. D.E. 61, 62.

On July 27, 2021, the Magistrate Judge scheduled the final approval hearing for August 17, 2021, and ordered Plaintiffs to file their retainer agreements and their attorney billing and cost records at least three days before the hearing. D.E. 81.  Additionally, the Magistrate Judge directed that "Plaintiff's counsel should be prepared to discuss at the hearing the amount of costs and how the settlement proceeds will be divided between Plaintiff and her attorney." D.E. 81. Additionally, on August 5, the Magistrate Judge ordered the parties, Mr. Frank, and TINA to provide specific, additional materials regarding the effectiveness of the proposed injunctive relief by August 16.  D.E. 84.

Class Counsel filed a declaration with the requested retainer and billing and expense information on August 13, 2022. D.E. 94. On August 14, 2022, the Magistrate Judge requested an additional detailed declaration that would expand on the information already provided regarding claims filed to date and document "how many of those claims

were submitted with proof of purchase, how many were submitted without proof or purchase and how many claimants are seeking the maximum under each of the two categories (i.e. $20 in the without-proof category and $65 in the with-proof category)." D.E. 95.  On August 15, 2022, the Magistrate Judge also requested a declaration providing a "calculation predicting how many claims will be submitted by December 10, 2021 and the breakdown of the claims (i.e., those with proof of purchase and those without proof of purchase)." D.E. 96. Along with additional requested information, the order further specified: "[T]he calculation shall include an approximation of how much money Defendants will be required to pay out based on all claims received by the hypothetical December 10, 2021 claims deadline. The calculation shall, if appropriate, also include a reasonable deduction for anticipated invalid claims. In the classic words of math teachers everywhere, Plaintiffs shall use a 'show-your-work' format, so that I can easily discern the details." D.E. 96.

On August 16, 2022, Angeion filed a supplemental declaration providing detailed information regarding the claims made through that date, including how they were made and whether they were made with or without proof of purchase.  D.E. 101-1.  Angeion advised the court

that as of August 16, 2022, they had received 23,130 claims without proof of purchase and 439 with proof of purchase. *Id.* p. 5.

Angeion further explained that they were beginning a supplemental notice campaign designed to generate more claims and that they expected an uptick in claims after that campaign and during the weeks before the deadline for filing claims (established as 45 days after entry of the final approval order).  *Id.* ¶¶ 12-14.  Plaintiffs' counsel also filed the requested supplemental declaration projecting, based on the Angeion data and experience in prior class actions, that there would $1,049,797 in claims by the Court's hypothetical December 10, 2021 claims filing deadline. D.E. 102-1 ¶ 10.

The Magistrate Judge conducted a three-hour final approval hearing on August 17, 2021. D.E. 103. The day after the hearing, he requested further submissions regarding the value of the injunctive relief from the parties, Mr. Frank, and TINA. D.E. 105. Following the hearing, Defendants and Plaintiffs engaged in further negotiations and agreed to amend the settlement's terms as related to the injunctive relief.  On September 16, Defendants filed the parties' Amended Settlement Agreement. D.E. 116. The court received additional briefing

related to the Amended Settlement Agreement's injunctive relief on September 24 and 29 and December 2. D.E. 122, 124, 125, 132.

On October 21, 2021, Plaintiffs filed, with permission from the Magistrate Judge, a supplemental declaration providing updated claims information. DE 130. As of October 14, 2021, the Settlement Administrator had received a total of 50,634 claims requesting a maximum monetary benefit of $935,332.50. *Id.* ¶ 7.

On December 15, 2021, the Magistrate Judge entered his 108-page R&R recommending that the District Court grant final approval of the parties' settlement. D.E. 133. Mr. Frank filed an objection to the R&R. In support of their response to the objection, D.E. 135. Plaintiffs' counsel filed a supplemental declaration with updated claims information reporting that as of January 10, 2022, 59,877 claims had been filed. D.E. 137-1 ¶ 7. Of those, 58,915 were submitted by way of the settlement website, and 962 by USPS. *Id.* In addition, 962 were with proof of purchase for a total amount of $55,867. *Id.* ¶ 11. 58,915 were without proof of purchase and totaled $1,053,315. *Id.* ¶ 9. In sum, there was a total amount of $1,109,1582 in claims made. *Id.* ¶ 8.

On March 17, 2022, after reviewing Mr. Frank's objection to the R&R and the parties' responses and conducting a de novo review,

District Court Judge Marcia Cooke found that Magistrate Judge Goodman's R&R was "thorough and well-reasoned" and adopted it as the court's Order.  D.E. 140.  This appeal followed.

## SUMMARY OF ARGUMENT

Mr. Frank has proceeded with this appeal, invoking this Court's jurisdiction, even though he has not shown, as required for Article III standing, that he has suffered a "concrete injury" or "real" harm as a result of his purchase of Defendants' product.  *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1262 (11th Cir.), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021). This is a false advertising case, and he has never claimed Defendants deceived him. And, now, the monetary relief portion of the settlement, which he has never challenged, will fully reimburse him for what he paid for the product.  As this Court recently emphasized, even during an appeal at the settlement stage of a class action, this Court must confirm that it has Article III standing, Since Mr. Frank cannot show he has experienced any concrete harm, this Court lacks Article III standing and should dismiss this appeal.

As for the merits of this appeal, the Magistrate Judge's 108-page R&R, which became the District Court's order, carefully analyzed the

terms of the settlement, applied well-established Eleventh Circuit authority regarding class actions and constructive common funds and the provisions of Rule 23(e)(2) of the Federal Rules of Civil Procedure, and determined that the settlement was fair, reasonable, and adequate. In order to side-step this Court's precedent, Mr. Frank has invented a change in the law, claiming that 2018 amendments to Rule 23(e)(2) significantly altered the lay of the land, even though the Advisory Committee denied any such intent in its note related to the amendments and Mr. Frank can cite to no court that has actually agreed that there has been a change in the law.

This Court should conclude that the District Court properly applied this Court's law governing constructive common funds and review of class action settlements. Under the abuse of discretion standard of review, no basis exists to reverse the District Court's determination that the settlement in this case should be approved.

## STANDARD OF REVIEW

This Court reviews an order approving a class action settlement for abuse of discretion. *In re Equifax*, 999 F.3d at 1273. "[B]ecause determining the fairness of the settlement is left to the sound discretion of the trial court, [this Court] will not overturn its decision absent a

26

clear showing of abuse of that discretion. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). As this Court noted in *Equifax*, "[t]his degree of deference to a decision approving a class action settlement makes sense. Settlements resolve differences and bring parties together for a common resolution." 999 F.3d at 1273 (cleaned up).  There is a "strong judicial policy favoring settlement." *Bennett*, 737 F.2d at 986.

## ARGUMENT

## I.  MR. FRANK LACKS ARTICLE III STANDING AND, THEREFORE, THIS COURT LACKS JURISDICTION OVER HIS APPEAL.

This Court, citing *Frank v. Gaos*, —— U.S. ——, 139 S. Ct. 1041, 203 L.Ed.2d 404 (2019), recently held: "[E]ven at the settlement stage of a class action, we must assure ourselves that we have Article III standing at every stage of the litigation." *Drazen v. Pinto*, 41 F.4th 1354, 2022 WL 2963470, *5 (11th Cir. 2022). *See also United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019) ("To have a case or controversy, a litigant must establish that he has standing, which must exist throughout all stages of litigation."). This Court pointed out that the Supreme Court recently further held that "'[e]very class member must have Article III standing in order to recover individual damages.'"

27

*Id.* (quoting *TransUnion LLC v. Ramirez*, ⸺ U.S. ⸺, 141 S. Ct. 2190, 2208 (2021).

The Court then explained: "Article III standing goes to the heart of our jurisdiction to hear cases in the first place. We cannot, therefore, check our Article III requirements at the door of the class action." *Id.* at *6.

As the Supreme Court explained in *Spokeo, Inc. v. Robins*, 578 U.S. 330, ___, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016), the "irreducible constitutional minimum of standing consists of three elements": "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548. Put more succinctly, "An injury is concrete if the harm is 'real.'" *In re Equifax*, 999 F.3d at 1262.

It is well established that objectors to class settlements require Article III standing. *See, e.g., In re First Cap. Holdings Corp. Fin. Prod.*

*Sec. Litig.*, 33 F.3d 29, 30 (9th Cir. 1994) (dismissing objection on Article III standing grounds when objector, though "technically qualified [] for membership in the class…asserts no economic or noneconomic injury."); *Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 580-1 (5th Cir. 2007) (unpublished) (proposed objector failed to provide "enough evidence" of Article III standing). *Devlin v. Scardelletti*, 536 U.S. 1, 6 (2002), upon which Mr. Frank exclusively relies, expressly states that its analysis does not address Article III standing. Although the *Devlin* Court assumed that the objector in that case possessed standing, the decision predates the analysis now required by *Spokeo* and *TransUnion.*

Here, Mr. Frank lacks standing because he has not shown that he suffered concrete harm and real injury as a result of his purchase of Neuriva.  Mr. Frank submitted an initial declaration supporting his Objection and a follow-up 30-page declaration providing additional detail regarding his standing to object. In both declarations, he provides only a single basis to establish his proposed injury: his purchase of a 30-count bottle of Neuriva Original.  D.E. 75-1 ¶ 4.

This Court has established that "an economic injury qualifies as a concrete injury," and "[a] person experiences an economic injury" and

has Article III standing "when, as a result of a deceptive act or an unfair practice, he is deprived of the benefit of his bargain." *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084, 1086 (11th Cir. 2019). However, Mr. Frank, in his two declarations and all of his numerous other filings in the District Court, never once stated that Defendants' deceptive acts or unfair practices deprived him of the benefit of his bargain. Instead, Mr. Frank—an attorney who devotes 29 out of 30 pages in his declaration to his personal experience and that of his institute in objecting to class action settlements—admitted to purchasing a bottle of Neuriva Original only after learning about the lawsuit about Neuriva.  Put differently, Mr. Frank never stated that Defendants' statements on its labeling misled him. *Compare* Plaintiffs Consolidated Amended Complaint, D.E. 51 ¶¶ 136, 142, 148, 154, 160.

Instead, Mr. Frank represented and provided evidence only that he purchased Neuriva Original on February 2, 2021 within the class period for personal use.  He made no showing of any concrete injury within the meaning of Article III.  In his initial declaration, he stated only: "On February 2, 2021, during the class period, I purchased a 30-count bottle of Neuriva Original from Amazon (sold by Pharmapacks)

for $21.95 for personal consumption for delivery in the United States."
D.E. 75-1 p. 2 ¶ 4. In response to Defendants' motion to strike, Mr.
Frank simply reiterated in a supplemental declaration: "I purchased
Neuriva for personal use before any HLLI attorneys or I had seen a
single document filed in this litigation." D.E. 108-2 p.2 ¶ 3.

However, in that supplemental declaration, Mr. Frank expanded
on his personal experience with Neuriva and other brain supplements.
*See generally* D.E. 108-2. He emphasized that he is quite knowledgeable
about nootropics—another word for brain supplements—and spends
hundreds of dollars a year on them, has several appointments a  year
with his doctor relating to a prescription nootropic, takes "dozens of
pills" every morning, regularly consults with a former attorney friend
who runs a successful nootropic business, tries new nootropics every
year, and monitors blogs, internet groups, and "recommendations or
medical literature [he] see[s] online" relating to nootropics. *Id.* ¶ 10.

While Mr. Frank describes his vast knowledge of the brain
supplement industry and his own personal experience, he still failed to
allege that he was in anyway "deceived." Mr. Frank even admitted that
he "looked [Neuriva] up online because of [his] interest in nootropics"
and "was intrigued by Neuriva's advertising on its Amazon page," *id.* ¶

31

13, but he still never stated that he was deceived by the advertising when he purchased the Neuriva. As such, Mr. Frank has shown no concrete injury such as failing to receive the benefit of his bargain.

Even if Mr. Frank had asserted he was deceived, he also cannot show an injury that is likely to be redressed by a favorable resolution of his appeal because he will receive full compensation under the settlement. Mr. Frank concedes that he submitted a claim for $21.95—the full amount of his purchase price—with a copy of his proof of purchase. D.E. 75-1 at ¶¶ 4-5. Under the settlement, Mr. Frank will receive the entirety of his economic injury. *See* D.E. 116-1 ¶ IV.B.2.a ("Settlement Class Members who provide Proof of Purchase may be entitled to recover up to thirty-two dollars and fifty cents ($32.50) per valid claim…").

The Ninth Circuit analyzed a nearly identical case in *In re First Cap. Holdings*. A class action settlement allowed annuity holders to reinstate annuity policies that had been terminated. 33 F.3d at 30. The proposed objector had done so, then cashed in her annuity, and not only received her full investment but actually profited. *Id.* The Ninth Circuit found the proposed objector lacked Article III standing because

32

"[s]imply being a member of a class is not enough to establish standing. One must be an aggrieved class member." *Id.* Because the objector "assert[ed] no economic or noneconomic injury," the Ninth Circuit dismissed the appeal for lack of standing. *Id.*

Similarly, even assuming Mr. Frank could show that he was injured when he purchased Neuriva, his sole purported injury—the loss of $21.95—will be fully redressed by the settlement, and he is therefore not aggrieved. Mr. Frank makes clear that he seeks the redress of general grievances with the settlement and not a remedy for any actual injury he has suffered. Appellant Br. p. 30 ("Frank is not making a Rule 23(e)(2)(C)(i) argument that the parties must settle for $40 million or the $8 million made available, or even a single dollar more than the $4 million or so the current settlement provides RB will pay.") Any "reallocation" that Mr. Frank seeks fails to redress his injury, which will be fully resolved under the settlement.

Mr. Frank has, therefore, attempted to invoke this Court's jurisdiction without establishing that he has Article III standing to do so. This appeal should be dismissed.

33

## II. <u>THE DISTRICT COURT PROPERLY APPLIED CONTROLLING ELEVENTH CIRCUIT STANDARDS FOR REVIEW OF CLASS ACTION SETTLEMENTS.</u>

This Court recently stated the requirements for approval of a class action settlement: "A class action may be settled only with court approval, which requires the court to find the settlement 'fair, reasonable, and adequate' based on a number of factors. Fed. R. Civ. P. 23(e)(2). This Court has also instructed district courts to consider several additional factors called the Bennett factors[.]" *In re Equifax Inc.*, 999 F.3d at 1273. Mr. Frank did not argue below (when objecting to the Magistrate Judge's R&R) and does not argue on appeal that the District Court erred in its consideration of the *Bennett* factors.

Rule 23(e)(2)—which governs approval of class action settlements—mandates:

(2) *Approval of the Proposal*. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A)  the class representatives and class counsel have adequately represented the class;

(B)  the proposal was negotiated at arm's length;

(C)  the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and

(D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. Pr. 23(e)(2).

Mr. Frank acknowledges that subsections 23(e)(2)(A), (B), and (C)(i) "are not at issue in this appeal." Appellant Br. 14. He also does not make any argument related to subsection 23(e)(2))C)(iv) or (D). In short, only Rule 23(e)(2)(C)(ii) and (iii) are at issue on appeal. Therefore, it is established that the class representatives and class counsel adequately represented the class (Rule 23(e)(2)(A)), that the settlement was negotiated at arm's length (Rule 23(e)(2)(B)), and that the settlement treats class members equitably relative to one another (Rule 23(e)(2)(D)). Lastly, Mr. Frank makes no argument on appeal that the District Court's award of attorneys' fees violated Rule 23(h).

With respect to the settlement itself, Mr. Frank has not contested the significant monetary benefits—he simply ignores them. Instead,

35

Mr. Frank's arguments—many expanded on for the first time on appeal—seek to use Rule 23(e)(2)(C)(ii) and (iii), which were adopted in 2018, to accomplish a broad overruling of this Court's prior rulings regarding common fund and claims-made settlements and the award of attorneys' fees. While Mr. Frank has not been successful in this campaign in other courts, he has adopted an "if at first you don't succeed, try, try again" approach.

A.    The District Court made Adequate Findings to Meet the Requirements of Rule 23(e)(2)(C)(ii) and (iii).

Although Mr. Frank urges that the 2018 amendments to Rule 23, which included adding 23(e)(2)(A)-(D), represented a substantial change in the law, the Advisory Committee's Note to the amendments explicitly states regarding the intent of the amendments: "The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern. Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court

36

and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."

As a leading treatise on class actions has observed, "[b]ecause the 2018 amendments codified existing practice, they are unlikely to generate a significant change in the settlement process or outcome." 4 Newberg on Class Actions § 13.48 (5th ed. Dec. 2021 Update). In short, contrary to Mr. Frank's urging, the 2018 amendments did not throw pre-2018 Amendment precedent out the window. That precedent still applies, together with Rule 23(e)(2), when a court analyzes whether to grant final approval to a class action settlement, as *Equifax*—and Mr. Frank in that case—and other courts implicitly acknowledge. *See Equifax*, 999 F.3d at1262 (concluding it was unnecessary to address application of the Rule 23(e)(2) factors because objectors, including Mr. Frank, did not raise them on appeal except for Mr. Frank saying "in passing that Rule 23(e)(2)(D) was not satisfied" without "any argument or authority").

Just as in *Equifax*, Mr. Frank's Objection to the settlement referenced Subsections 23(e)(2)(C)(ii)-(iii) only once in a single sentence: "The Court must consider the entire settlement agreement, including

37

'the effectiveness of any proposed method of distributing relief to the class' and 'the terms of any proposed award of attorney's fees, including timing of payment.' Rule 23(e)(2)(C)(ii)-(iii)." D.E. 75 p. 32.

Mr. Frank made no actual argument at all in his Objection regarding Rule 23(e)(2)(C)(ii) ("the effectiveness of any proposed method of distributing relief to the class") even though Rule 23(e)(5) requires objectors to class settlements to "state with specificity the grounds for the objection." Nonetheless, even though not labeled with the actual rule number, the Magistrate Judge's R&R did specifically address Rule 23(e)(2)(C)(ii) ("the effectiveness of any proposed method of distributing relief to the class").

The Magistrate Judge first noted that he had previously "approved the procedure for giving Class Notice to the members of the Settlement Class," and he expressly found "that the Class Notice substantially in the form approved by the Court in its preliminary approval order was given in the manner ordered by the Court, constitutes the best practicable notice, and was fair, reasonable, and adequate, and that the Parties have complied with their obligations under the Class Action Fairness Act, 28 U.S.C. § 1715." D.E. 133 p. 13 n.3.

Further, the R&R also specifically discussed the fact that the proposed settlement allowed class members to receive monetary benefits under the settlement both with and without proof of purchase. D.E. 133 p. 48; *see also* pp. 82-84. The R&R further found that the "Settlement provides immediate and substantial monetary relief to the Settlement Class with payments approximating a significant percentage of Settlement Class Members' actual damages." D.E. 133 p. 49. If Mr. Frank, at the time he filed his Objection, believed that further findings were necessary under Rule 23(e)(2)(C)(ii), he should have said so.

Although Mr. Frank in his objection to the Magistrate Judge's R&R refocused his arguments to rely more extensively on Rule 23(e)(2)(C)(ii), district courts are not obligated to consider new arguments raised for the first time in an objection to a report and recommendation. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir.2009) ("[A] district court has the discretion to decline to consider a party's argument when the argument is not first presented to the magistrate judge."); *see also* S.D. Fla. Local Magistrate Judge Rule 4(b) ("A District Judge shall make a de novo determination of those portions

39

of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge."). Mr. Frank's complaint on appeal that the District Court failed to address his objection as it related to Rule 23(e)(2)(C)(ii) is disingenuous.

As for the factor in Rule 23(e)(2)(C)(iii)—"the terms of any proposed award of attorney's fees, including timing of payment"—Mr. Frank's complaint that the District Court did not address his objections at all is inexplicable. Beginning at D.E. 133 p. 55 and continuing through p. 93, the R&R adopted by the District Court, under the heading "The Objections" and the subheading (in bold) "Attorney's Fees and Costs," addressed "the terms of any proposed award of attorney's fees" as required by Rule 23(e)(2)(C)(iii).

Because the District Court considered the factors set forth in Rule 26(e)(2), as required by the Rule, the remaining question is whether the District Court abused its discretion in finding that the settlement was fair, reasonable, and adequate.

B.     <u>The 2018 Amendments did not Change Controlling Eleventh Circuit Law and the District Court's Decision is a Mainstream Application of that Law.</u>

The strategy behind Mr. Frank's claim that the 2018 amendments to Rule 23 were a game-changer is transparent. He seeks a means of avoiding longstanding, controlling Eleventh Circuit authority that supports the District Court's approval of the parties' proposed settlement. However, Eleventh Circuit precedent cannot be so cavalierly erased.

The Eleventh Circuit has long held that awarding attorneys' fees based on a "reasonable percentage of the fund established for the benefit of the class" is "the better reasoned" approach. *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768,774 (11th Cir. 1991) (remanding for determination of reasonable attorneys' fee based on a percentage of a reversionary common fund). In typical common fund cases, like *Camden I*, "the defendant pays a lump sum of cash, a percentage of which is awarded to class counsel." *In re Home Depot Inc.*, 931 F.3d 1065, 1092 (11th Cir. 2019).

In claims-made settlements, however, parties agree that the defendant will pay the claims of class members up to a specified

amount. In addition, the parties may then also agree that the defendant will pay the plaintiff class's attorneys' fees separately either in a designated amount or up to a specified amount. *Home Depot*, 931 F.3d at 1092. Courts define this type of settlement as a "constructive common fund." *Id.* In those cases, "Courts have included the expected attorney's fees in the class benefit, reasoning that the payment to the class and the payment to counsel were negotiated as a package deal, so that the defendant reduced the payment to the class to account for the expected payment to counsel." *Id.*

The law has also been longstanding in the Eleventh Circuit that when reviewing constructive common fund settlements, the district court should calculate what percentage the agreed-upon attorneys' fees are of the total amount *available to the class* and—contrary to Mr. Frank's argument—not the amount ultimately actually paid out to the class. *Waters v. Intern. Precious Metals Corp.*, 190 F.3d 1291, 1295 (11th Cir. 1999) ("[N]o case has held that a district court must consider only the actual payout in determining attorneys' fees."); *see also Carter v. Forjas Taurus, S.A.*, 701 Fed. Appx. 759, 767 (11th Cir. June 29, 2017) (rejecting objectors' argument that "the attorney's fee should have been

42

calculated based on the amount actually paid to the class" because "this is not required by our precedent"); *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 630 (11th Cir. July 16, 2015) (per curiam) (same).

Mr. Frank, however, points to *Home Depot*'s explanation that "[i]n mathematical terms, the equation for the percentage method in constructive common-fund cases effectively works like this: the actual payment to counsel is the product of (1) the percentage the court decides to award, and (2) the payment to the class plus the expected payment to counsel (together, the class benefit)." 931 F.3d at 1092. However, when this sentence is read in the context of the entire paragraph defining a "constructive common fund," it is apparent that "the payment to the class" refers to the amount that the parties agreed upon during negotiations between class counsel and defendant. *Id.* This is especially apparent given that *Home Depot* cited to *Waters* and then later rejected Home Depot's argument that the constructive common fund should not include amounts originally intended to go to putative class member banks that were never paid because the banks released Home Depot. *Id.* at 1092, 1094.

In support of this holding that the constructive common fund includes amounts intended for class members not ultimately paid, the

43

*Home Depot* panel, relied, *id.* at 1094, on the Supreme Court's decision in *Boeing v. Van Gemert*, 444 U.S. 442, 478, 100 S.Ct. 745, 749 ("Since the decisions in *Trustees v. Greenough*, 105 U.S. 527, 26 L. Ed. 1157 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L. Ed. 915 (1885), this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.").

*Boeing* explained the basis for its ruling: "The common-fund doctrine reflects the traditional practice in courts of equity, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees. The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Id.* (cleaned up).  In common fund cases,

> each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf. Once the class representatives have established the defendant's liability and the total amount of damages, members of the class can obtain their share of the recovery simply by proving their individual claims against the judgment fund. . . . To claim their logically ascertainable shares of the judgment fund,

absentee class members need prove only their membership in the injured class. *Their right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel.* Unless absentees contribute to the payment of attorney's fees incurred on their behalves, they will pay nothing for the creation of the fund and their representatives may bear additional cost.

*Id.* at 479-80 (emphasis added). In short, attorneys, through their efforts, create an opportunity for class members, and the attorneys should not be prejudiced if class members choose not to take advantage of that opportunity.

While Mr. Frank claims that *Boeing* should be disregarded because of its age, this Court recently not only again cited *Boeing*, but also relied upon the two cases that were the basis for *Boeing*'s holding—*Greenough* and *Pettus*—as the "seminal cases establishing the rule—applicable in so many class-action cases, including this one—that attorneys' fees can be paid from a 'common fund.'" *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1255–56 (11th Cir. 2020). There can be little question that *Boeing* is still the law as so many courts have continued to recognize.

Although Mr. Frank attempts to dismiss *Boeing* and *Waters* as irrelevant because they involved an appeal by a defendant rather than

an objector, that is a distinction without a difference, as *Carter* and *Poertner*, which both involved objectors' appeals, demonstrate. *See also In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 177 n.11 (3d Cir. 2013) ("In *Boeing*, the fund was created following the determination of plaintiffs' claims rather than pursuant to a settlement. We do not believe this significantly alters the analysis." (cleaned up)). Mr. Frank is aware of the Eleventh Circuit's position, as he unsuccessfully made identical arguments in *Poertner*. This Court first observed: "While no published opinion of ours extends *Camden I* 's percentage-of-recovery rule to claims-made settlements, no principled reason counsels against doing so. For, as one learned treatise aptly illustrates, properly understood '[a] claims-made settlement is ... the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant; indeed, the two types of settlements are 'fully synonymous.'" *Poerner*, 618 F. App'x at 629 (quoting 4 William B. Rubenstein, Newberg on Class Actions § 13:7 (5th ed.2011)). This Court then rejected the argument Mr. Frank makes here: "Frank claims that the settlement is unfair because class counsel's slice of the settlement pie is too large (i.e., the fees-and-costs award is unreasonable). But this

46

objection is based on Frank's flawed valuation of the settlement pie: limiting the monetary value to the amount of Gillette's actual payments to the class along with excluding the substantial nonmonetary benefit and the cy pres award." *Id.* at 630.

While Mr. Frank argues that the Magistrate Judge erred as a matter of law by relying on *Poertner* since it is an unpublished opinion, it is readily apparent from the R&R that the Magistrate Judge appropriately treated *Poertner* as persuasive rather than controlling authority—as demonstrated by his listing of numerous other decisions from the Southern District of Florida applying the "principle" from *Poertner*. That would hardly be a necessary exercise if *Poertner* were controlling authority. D.E. 133 p. 73.

Indeed, there should be little question that *Poertner is* persuasive authority given that, at present, Westlaw indicates that 59 other opinions have favorably cited *Poertner*. Moreover, the decision below joins numerous decisions within the 11th Circuit holding that attorneys' fees allowed in connection with constructive common funds arising out of claims-made settlements may be based on the agreed-upon class amount rather than the actual amount paid to class members. *See, e.g.,*

47

*Ferron v. Kraft Heinz Foods Co.*, No. 20-CV-62136-RAR, 2021 WL 2940240, at *18 (S.D. Fla. July 13, 2021) (holding that "in the Eleventh Circuit, class counsel is awarded a percentage of the funds made available through a settlement, not the amount of funds actually paid out"); *Wilson v. EverBank*, No. 14-CIV-22264, 2016 WL 457011, at *13 (S.D. Fla. Feb. 3, 2016) ("Both the United States Supreme Court and the Eleventh Circuit have expressly approved calculating fees by applying the percentage-of-recovery method to the total value of the settlement.").

C.    Other Circuits have Adopted the Same Constructive Common Fund Analysis as the Eleventh Circuit.

The Eleventh Circuit's approach is not novel but rather parallels that of other Circuits.    The Sixth Circuit, in an opinion cited approvingly by this Court in *Home Depot*, addressed the same argument Mr. Frank makes here: that a percentage-of-the fund should be calculated using the value of the claims paid.    The court surveyed the law of the Circuits and, based on that review, concluded "that it is within the discretion of a district court both to select a lodestar computation as the appropriate method of fee calculation *and, if choosing to use or include a percentage of the fund calculation, to value*

48

*the benefit to the class based on the total relief class counsel makes available to all the class members.* Gascho v. Glob. Fitness Holdings, LLC, 822 F.3d 269, 278 (6th Cir. 2016) (emphasis added) (noting also that *Boeing* "does not support the benefit calculation that [the objector] proposes").

Other Circuits have likewise refused to limit the "constructive common fund" to the amount actually paid out, as opposed to the negotiated fund made available to the class. *See also In re: Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1120–21 (10th Cir. 2017) (adopting Sixth Circuit approach); *Dewey v. Volkswagen Aktiengesellschaft*, 558 F. App'x 191, 197 (3d Cir. 2014) ("Granted, this case does not involve a true common fund because Volkswagen is paying the fee out of its own pocket and not through the reimbursement fund. However, where the reality is that the fund and the fee are paid from the same source—in this case, Volkswagen—the arrangement is, for practical purposes, a constructive common fund, and courts may still apply the percent-of-fund analysis in calculating attorney's fees." (cleaned up)); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436–37 (2d Cir. 2007) ("The entire Fund, and not some portion thereof,

is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not. We side with the circuits that take this approach"); *Williams v. MGM-Pathe Communs. Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) ("We conclude that the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar.").

In addition, the current version of the Manual on Complex Litigation explains: "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses, both amounts must be disclosed to the class. Moreover, the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." Manual Complex Lit. § 21.7 (4th ed. May 2022 Update).

Mr. Frank, however, in an effort to avoid existing law, argues that the 2018 addition of Rule 23(e)(2)(C)(ii) changed the law and requires courts, as a matter of law, to ignore the amount made available to the

class through the settlement and look only at the amount actually paid out. No court has adopted Mr. Frank's construction of Rule 23(e)(2)(C)(ii) or even alluded to it as a possibility—a fact hardly surprising given the actual text.

Rule 23(e)(2)(C)(ii) requires courts to take into account "the effectiveness of *any proposed method of distributing relief* to the class, including the method of processing class-member claims." (Emphasis added). Mr. Frank argues that "Rule 23(e)(2)(C)(ii) requires courts to consider the *effectiveness* of distributing relief to the class—the amount class members *actually* receive." Appellant Br. p. 49 (emphasis original). But this is not what the rule says; Rule 23(e)(2)(C)(ii) requires the court to consider the effectiveness of *the method* of distribution. In other words, courts are to consider what methods of distributing relief would be effective when weighing final approval, and Mr. Frank cannot dispute that the district court made such a consideration. The only way to arrive at Mr. Frank's conclusion is to rewrite Rule 23(e)(2).

Mr. Frank's lack of support for this position is hardly surprising given the plain language of the Rule. Moreover, the Advisory

51

Committee Notes to the 2018 Amendments explain with respect to Rule 23(e)(2)(C)(ii) (emphasis added): "Often it will be important for the court to scrutinize the *method of claims processing* to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." Likewise, Newberg on Class Actions underscores that this subfactor addresses the "distribution method" and notes that "the goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." 4 Newberg on Class Actions § 13:48.

In an apparent attempt to disguise his lack of authority, Mr. Frank immediately follows his assertions about Rule 23(e)(2)(C)(ii) with a new paragraph proclaiming: "Indeed, every appellate court considering the 2018 Amendments has repudiated the "made available" fiction. He then cites two decisions: *Briseño*, 998 F.3d at 1024-26 and *In re Samsung Top-Load Washing Machine Mktg., Sales Practices & Prods. Liab. Litig.*, 997 F.3d 1077, 1094 (10th Cir. 2021). Not only does neither opinion discuss Rule 23(e)(2)(C)(ii), but in addition neither case "repudiate[s] the 'made available' fiction."

The Ninth Circuit *Briseño* panel, of course, could not overrule the prior Ninth Circuit *Williams* decision. Nor did it attempt to do so. Instead, in a footnote, the panel acknowledged that it had "not address[ed] whether the settlement agreement amount[ed] to a constructive common fund" and directed that "the district court on remand should review the settlement structure to determine whether to apply common fund principles to its 23(e) inquiry." *Briseño*, 998 F.3d at 1023 n.1. Since it had not even decided whether the settlement was a constructive common fund, it could not have decided whether the fund would only be based on the actual amounts paid to the class.

Similarly, the 10th Circuit *Samsung* panel remanded for the district court to give the settlement "heightened scrutiny," advising that the "district court, after carefully reviewing billing records and performing the traditional lodestar analysis, should crosscheck the fees and costs award against *both* the value of the settlement and the estimated actual cost to the defendant." 997 F.3d at 1094 (emphasis added). Again, the panel could not overrule the previously-decided Tenth Circuit *In re: Motor Fuel Temperature Sales Pracs. Litig.* decision. And there is no need to read it as doing so. Instead, the

opinion merely directs that when fees are being decided based on lodestar (as opposed to the constructive common fund), and the district court is doing a crosscheck, the court should look at *both* the total value of the agreed-upon settlement and what the defendant actually has to pay out. *Id.*

*Briseño* and *Samsung* do not dictate—as Mr. Frank argues here—that when awarding fees based on a percentage, it must be a percentage of the actual amount paid to the class plus the agreed-upon fee amount rather than, as this Court has held, a percentage of the agreed-upon class settlement fund plus the agreed-upon fees. Neither case provides any reason for this Court to revisit its established law on common funds and constructive common funds.

In fact, the only Circuit that has definitively adopted Mr. Frank's position is the Seventh Circuit in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), which adopted a *per se* rule that when awarding attorney's fees based on a percentage the correct ratio to calculate is always that of "(1) the fee to (2) the fee plus what the class members received." *Id.* at 781.  In establishing this rule, the Seventh Circuit—contrary to this Court—concluded that *Boeing* was irrelevant.  Since *Pearson* cannot be reconciled with this Court's prior rulings or the

majority of courts across the country addressing constructive common funds, the District Court in this case certainly did not err in disregarding *Pearson*.

In short, the District Court could properly choose to evaluate the potential $2.9 million fee through use of a constructive common fund analysis in which the percentage is calculated using the proposed fee as the numerator and the denominator being the combination of the agreed-upon class fund + the agreed-upon maximum attorneys' fee.

D.  <u>Mr. Frank's Claim that the Attorneys' Fee Amounts to a Disproportionate Allocation as a Matter of Law is Contrary to Eleventh Circuit Authority.</u>

Mr. Frank's argument that the attorneys' fee provision of the settlement violates Rule 23(e)(2)(C) hinges on this Court agreeing to disregard *Boeing*, overrule *Waters*, deem *Poertner* unpersuasive, and reject the reasoned decisions of the Second, Third, Sixth, Ninth, and potentially Tenth Circuits. His claim that "[t]he Settlement is unfair as a matter of law because class counsel's fee award consumes about three fourths of the total benefit" depends on this Court adopting the formula mandated by the Seventh Circuit. Appellant Br. p. 23.

Under this Court's rule, however, the proper calculation is $2,900,000 divided by ($8 million + $2,900,000). The relevant

percentage is calculated by dividing the proposed fee by the constructive common fund, which is equal to the total fund allocated for the class plus the separately allocated fee. The result of that calculation in this case is 26.6%.

The Magistrate Judge erroneously noted: "The $2.9 million sought by Class Counsel for fees and expenses constitutes 36% of the value of just the monetary relief made available to the Settlement Class, which is well within the range approved by the Eleventh Circuit."  Apparently, the Magistrate Judge divided the $2.9 million by just the amount of the class fund ($8 million), which is not the proper formula for constructive common funds.  Since 26.6% is at an even lower end of the range of fees approved by this Court, correction of this miscalculation simply further supports the District Court's decision. Significantly, Mr. Frank, who undoubtedly noted the error, makes no argument that either 26.6% or 36% would be a disproportionate fee.

Instead, he seeks reversal by continuing his pursuit for a court willing to hold that "clear-sailing" and "kicker" agreements are *per se* unlawful. The Sixth Circuit, in its comprehensive *Gascho* decision, explained: "Neither clear sailing provisions nor kicker clauses have ever

been held to be unlawful per se, but courts have recognized that their inclusion gives the district court 'a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class.' *Bluetooth*, 654 F.3d at 948." The *Gascho* court found no error in its case because "[h]ere, the R & R did peer into the relief to the class and the attorney's fees at issue, and found both to be appropriate." *Id.*

The same is true here. The Magistrate Judge expressly acknowledged the "heightened duty" standard and concluded, based on his scrutiny of the negotiations between the parties (D.E. 133 pp. 38-40), that there was no collusion between the parties, and the "clear sailing" and "kicker" provisions did not require rejection of the settlement. D.E. 133 pp. 86-89. Especially in the absence of a disproportionate fee, Mr. Frank has failed to show that the District Court abused its discretion in concluding that the "clear sailing" and "kicker" provisions were insufficient to justify denying final approval of the settlement.

The Sixth Circuit reached the same conclusion under similar circumstances. *See Gascho*, 822 F.3d at 291 (finding objector's concern

about clear sailing and kicker provisions "unwarranted here because the district court unreservedly found that the relief to the class was 'substantial' and that class counsel's fee request was appropriate, findings it made within its legitimate discretion. The lengthy R & R extensively discussed both relief and fees, and did not exhibit any inclination to find that the former was inadequate or the latter was excessive.").

Moreover, in *In re Samsung* , 997 F.3d at 1088-89, on which Mr. Frank relies, the Tenth Circuit stated: "To our knowledge, no court has adopted a per se rule against inclusion of 'kicker' and 'clear-sailing' agreements in settlements. . . .And there is good reason for not automatically rejecting settlements with 'kicker' agreements." The court explained: "'Kicker'" agreements can valuably further negotiations by allowing defendants to establish their maximum liability" while also "avoid[ing] situations where participating class members receive a windfall, well above their actual damages, at the expense of the defendant." *Id.* at 1089. With respect to "clear-sailing agreements," the court likewise noted that not every such provision demonstrates collusion and courts have affirmed final approval of settlements having

both a "kicker" provision and a "clear-sailing provision." *Id.* (citing cases). The court reiterated: "it has long been recognized that 'kicker' and 'clear-sailing' agreements can play an important role in class action settlement negotiations because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. *Id.* (internal quotation marks omitted).

In contrast, cases in which the "clear sailing" and "kicker" provisions played an important role on appeal also involved substantial concerns about the relief, monetary and otherwise, being given the class. Mr. Frank has never challenged in this case the monetary recovery afforded to class members (even without proof of purchase), essentially ignoring its existence. However, the lack of similar compensation or other comparable relief was the rationale underlying the decisions of the courts upon which Mr. Frank relies. *See, e.g., In re Dry Max Papers Litig.*, 724 F.3d 713, 716, 718-19 (6th Cir. 2013) (a Rule 23(b)(2) class for injunctive relief in which attorneys received $2.78 million while the class received a refund for one box of diapers if they had a receipt and UPC code from a box purchased up to eight years earlier, a general warning on the box about diaper rash, and minimal

and obvious medical advice about diaper rash posted on the Pampers website); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 938 (9th Cir. 2011) ("The settlement agreement approved in this products liability class action provides the class $100,000 in *cy pres* awards and zero dollars for economic injury, while setting aside up to $800,000 for class counsel and $12,000 for the class representatives—amounts which the court subsequently awarded in full in a separate order.").

Since the attorneys' fee award easily falls within the range authorized by this Court and the Magistrate Judge acknowledged his obligation to scrutinize whether the clear sailing and kicker provisions adversely impacted the class's recovery, this Court should conclude that the District Court did not abuse its discretion in declining to reject the settlement because of those provisions.

E.    Mr. Frank did not Preserve any Argument Below Related to the "Method of Distribution" under Rule 23(e)(2)(C)(ii).

Although Mr. Frank's brief is not entirely clear, it appears that he may be arguing for the first time on appeal that the claims process in this case was ineffective under Rule 23(e)(2)(C)(ii). *See* Appellants Br. pp. 34-37. As he has in other cases, Mr. Frank seems to be arguing on appeal that a claims process requiring submission of a claim form, even

electronically, is not sufficiently effective and that directly mailing a check to the class members would have been more effective.

He made no claim below before the Magistrate Judge or the District Court Judge that the claims process in this case was at all burdensome—it is not—or that filing a claim electronically was decreasing the claims rate. Nor did he raise the possibility of direct mail. Had he made this argument, a proper record could have been developed. *See, e.g., Briseño*, 998 F.3d at 1026 (observing under Rule 23(e)(2)(C)(ii) that requiring direct notice to consumers "would likely not be cost-effective, with administrative and notice costs devouring most of the settlement fund").

Other courts have addressed the issue on appeal. In *Gascho*, 822 F.3d at 290, the objectors involving gym memberships "assert[ed] that a check simply should have been mailed to the address listed for each class plaintiff because common sense dictates that direct payment would have resulted in a payout greater than 8% of the claims made." The Sixth Circuit in rejecting this argument pointed out: "This ignores the inadequate member data, the number of the checks that would not have reached the class members and the administrative costs of

61

managing that procedure." *Id.* The court concluded: "Here, there is every indication that [counsel] diligently attempted to reach each class member: multiple forms of notice were provided, including ads in 13 different newspapers, a website, and a dual email and postcard mailing approach targeting individual class members. The actual claim form was also short and straightforward." *Id.* The same is true in this case. *See also In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *8 (N.D. Ga. Mar. 17, 2020), *aff'd in part, rev'd in part and remanded*, 999 F.3d 1247 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431, 211 L. Ed. 2d 254 (2021), *and cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765, 211 L. Ed. 2d 479 (2022) (finding compliance with Rule 23e(2)(C)(ii) when class member could file claims through "a straightforward claims process" even though documentation of their out-of-pocket losses was required since such requirements are "routine" and less stringent than would be necessary during discovery).

The Third Circuit, in a case relied on by Mr. Frank, cautioned against reducing attorneys' fees based on low claims rate: "There are a variety of reasons that settlement funds may remain even after an

exhaustive claims process—including if the class members' individual damages are simply too small to motivate them to submit claims. Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of representation they provided. Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable." *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013).

This issue should not be addressed for the first time on appeal. But, regardless, Mr. Frank has not shown that there was in fact anything ineffective about the actual claims process here, which was an appropriate process.

## III.   **THE INJUNCTIVE RELIEF IS A PROPER AND VALUABLE ASPECT OF THE SETTLEMENT.**

Injunctive relief was an important part of the relief Class Counsel sought for the Class and, consequently, Class Counsel insisted on, and obtained, changes to Neuriva's labeling that ensured that the label and ancillary marketing did not make false statements. Although Plaintiffs refused to settle unless Defendants agreed to remove their most egregious claims from their marketing, Plaintiffs never sought to place

a monetary value on the injunctive relief to be used to justify a particular amount of attorneys' fees. It was unnecessary since Plaintiffs' attorneys' fee request fell within the percentage range that the Eleventh Circuit has held is reasonable.

Instead, as the Magistrate Judge properly noted, the injunction "should be factored into the overall analysis of the settlement." D.E.133 p. 4. Given the fact that the Magistrate Judge did not attribute any specific economic value to the injunctive relief, it is not entirely clear what Mr. Frank is arguing. Since Mr. Frank does not object to the monetary relief and given that even if there were a problem with the attorneys' fees, they could be reduced, then is Mr. Frank still arguing that final approval should be reversed based solely on the injunctive relief? Mr. Frank's brief does not seem to say.

He primarily argues that the prospective relief cannot benefit past purchasers. The Ninth Circuit disagrees. In addressing the question whether a class representative is entitled to seek prospective injunctive relief, the Ninth Circuit has held: "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future. In some cases, the threat of future harm may

64

be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-71 (9th Cir. 2018).

Under *Davidson*, a plaintiff is able to seek injunctive relief in the false advertising context, even though she is no longer deceived, by alleging that in the absence of an injunction, "she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Id.* at 969-70. Thus, for class members who would like to purchase the Neuriva products in the future, injunctive relief would be of value.

Finally, Mr. Frank criticizes the Magistrate Judge for citing *Poertner* as persuasive authority for his decision that the proposed injunction provided support for approval of the settlement given that the change in labelling was attributable to the litigation, as Defendants' change in labelling is in this case. 618 Fed. Appx. at 629. It is no more inappropriate for the Magistrate Judge to decide in his discretion that *Poertner*, an unpublished Eleventh Circuit decision, is supportive of his decision that it would be for him to find persuasive a decision from another Circuit. The Court should, therefore, find no abuse of discretion

65

in the District Court's ruling with respect to the settlement's proposed injunctive relief.

## CONCLUSION

For all the above reasons, this Court should affirm the decision of the District Court finally approving the parties' settlement.

Respectfully submitted,

_____/s/ Martha A. Geer_____
Daniel K. Bryson
Martha A. Geer
Patrick M. Wallace
Mark R. Sigmon
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
900 West Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: 919-600-5035
dbryson@milberg.com
mgeer@milberg.com
pwallace@milberg.com
msignom@milberg.com

Nick Suciu
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
1644 Bracken Rd.
Bloomfield Hills, MI 48302
Telephone:(313) 303-3472
nsuciu@milberg.com

Matthew D. Schultz (Fla. Bar No. 640326)
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, PA
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7140
Facsimile: (850) 436-6140
mschultz@levinlaw.com

L. Timothy Fisher
Blair Reed
Sarah Westcot
BURSOR & FISHER, P.A.
1990 North California Blvd, Ste. 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ltfisher@bursor.com
breed@bursor.com
swestcot@bursor.com

Jonathan Shub
Kevin Laukaitis
SHUB LAW FIRM LLC
134 Kings Hwy E, 2nd Floor
Haddonfield, NJ 08033
Telephone: (856) 772-7200
jshub@shublawyers.com
klaukaitis@shublawyers.com

Attorneys for Plaintiffs and the Class

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. Proc. 32(a)(7)(B) because this brief contains 12,938 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4, as counted by Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: 15 August 2022.                     */s/ Martha A. Geer*
                                           Martha A. Geer
                                           Milberg Coleman Bryson
                                           Phillips Grossman, PLLC


## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiffs-Appellants hereby certifies that she has this day caused a copy of the foregoing document to be filed with the 11th Circuit Court of Appeals CM/ECF filing system which will provide counsel of record with notice of the filing.

Dated: 15 August 2022.                     */s/ Martha A. Geer*
                                           Martha A. Geer
                                           Milberg Coleman Bryson
                                           Phillips Grossman, PLLC