[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11232

_____

DAVID WILLIAMS,
Individually and on behalf of all others similarly situated,
CAROLL ANGLADE,
Individually and on behalf of all others similarly situated,
HOWARD CLARK,
THOMAS MATTHEWS,
MARTIZA ANGELES,

Plaintiffs-Appellees,

*versus*

RECKITT BENCKISER LLC,
RB HEALTH (US) LLC,

Defendants-Appellees,

THEODORE H. FRANK,

                                                    Interested Party-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-23564-MGC

_____

Before WILLIAM PRYOR, Chief Judge, MARCUS, Circuit Judge, and
MIZELLE,* District Judge.

MARCUS, Circuit Judge:

    This is an appeal from a district court order approving a
class-action settlement that purports to provide injunctive relief
and up to $8 million in monetary relief to a class of individuals (the
"Class") who purchased one or more "brain performance supple-
ments" manufactured and sold by Defendants Reckitt Benckiser
LLC and RB Health (US) LLC (together, "RB") under the brand
name "Neuriva." Five Plaintiffs (together, the "Named Plaintiffs")
who had previously purchased Neuriva brought this putative class
action, alleging that RB used false and misleading statements to

_____

* Honorable Kathryn Kimball Mizelle, United States District Judge for the
Middle District of Florida, sitting by designation.

give consumers the impression that Neuriva and its "active ingre-dients" had been clinically tested and proven to improve brain function, in violation of Florida, California, and New York con-sumer protection laws. The parties promptly agreed to a global settlement (the "Settlement" or "Settlement Agreement") that sought to resolve the claims of all Plaintiffs and absent Class mem-bers, before any formal discovery or motion practice had been completed.

Obviously, the settling parties do not contend that the dis-trict court erred in approving the Settlement; rather, this appeal comes to us because one unnamed Class member, an attorney and frequent class-action objector, Theodore Frank, objected in district court and subsequently appealed the district court's approval or-der. In essence, Frank argues that the parties inflated the perceived value of the Settlement by touting that RB would pay up to $8 mil-lion to Neuriva purchasers -- knowing all the while that few Class members would complete the process of submitting claims to re-ceive payment -- and imposing changes to RB's marketing that would not benefit past purchasers of Neuriva and that were mean-ingless in any event. This, Frank contends, allowed Plaintiffs' counsel to secure a disproportionately large fee award (some $2.9 million) while decreasing the overall payout required of RB.

Whatever the merits of Frank's claims, they will have to wait for another day because, after thorough review of the record and with the benefit of oral argument, we conclude that the Named Plaintiffs lack standing to pursue their claims for injunctive relief.

Under longstanding Supreme Court precedent, plaintiffs seeking injunctive relief must establish that they are likely to suffer an injury that is "actual or imminent," not "conjectural or hypothetical." But none of the Named Plaintiffs allege that they plan to purchase any of the Neuriva Products again in the future -- to the contrary, the operative complaint gives every indication that they will not again purchase any of the Neuriva Products because they are "worthless." The district court, therefore, lacked jurisdiction to award injunctive relief to the Named Plaintiffs or absent Class members, and its approval of the Settlement Agreement (which was based in real part on the award of injunctive relief) was an abuse of discretion. Accordingly, we **VACATE** the district court's order and **REMAND** for proceedings consistent with this opinion.

## I.

### A.

RB manufactures and sells a line of three "brain performance supplements" under the brand name Neuriva: Neuriva Original, Neuriva Plus, and Neuriva De-Stress (together, the "Neuriva Products"). RB advertises that the Neuriva Products have been "clinically and scientifically proven to enhance the brain health and performance of all adults in specific ways." Thus, for example, RB informs consumers that taking any of the Neuriva Products will help them "brain better" by improving "focus," "accuracy," and "concentration." Neuriva Original and Plus are also claimed to improve users' "memory" and "learning," while Neuriva De-Stress, RB promises, will aid in "stress reduction" and "relaxation." RB also

advertises that the Neuriva Products each contain several "active ingredients" that have themselves been clinically proven to improve brain physiology and function.

In 2020, three sets of Plaintiffs filed three separate putative class action complaints against RB in the Eastern District of California, the Southern District of New York, and the Southern District of Florida -- all later consolidated into a single class-action complaint in the Southern District of Florida. This consolidated class action alleges that RB's advertising for the Neuriva Products employed false and misleading statements in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, and the New York General Business Law, N.Y. Gen. Bus. L. § 349. It also alleges unjust enrichment on the same theory.

The complaint identifies a number of different representations and statements made by RB as false and/or misleading. For instance, Plaintiffs allege that RB's advertising falsely leads consumers to believe that the Neuriva Products have undergone clinical and/or scientific testing to prove their efficacy, when, in fact, none of the Products have been tested. *See, e.g.*, Consol. Amended Class Action Compl. ¶ 64 ("The singular message throughout Defendants' marketing of Neuriva is that Neuriva is scientifically and clinically proven, as a matter of fact, to increase brain performance.");

*id.* at ¶ 66 ("Defendants' statements on their labels and in their advertising convey to reasonable consumers, and reasonable consumers would believe, that the state of the science regarding Neuriva and its ingredients has reached a level of scientific consensus such that [Neuriva's] claims of increased or enhanced brain performance are established truths and statements of fact.").  And the complaint further alleges that each of the Neuriva Products "trumpet[s]" various active ingredients, such as "coffee cherry extract," as having been clinically proven to improve brain physiology and function, when in fact "scientific evidence shows that it is biochemically impossible for the ingredients to improve brain performance."

Each of the five Named Plaintiffs in the operative complaint allege that they purchased at least one Neuriva Product between 2019 and January 2020.  But, notably, none of the Named Plaintiffs allege that they purchased Neuriva De-Stress specifically; they only allege that they purchased Neuriva Original, Neuriva Plus, or "Neuriva," unspecified.

**B.**

Before Plaintiffs consolidated the three pending actions in the Southern District of Florida, RB moved to dismiss the California and Florida actions, raising a number of defenses including a failure to sufficiently allege falsity, federal preemption, and failure to plausibly allege that a reasonable consumer would be deceived by Neuriva's labels.  While these motions were pending, the parties engaged in settlement discussions, including two full-day

mediations.  On January 7, 2021, before any formal discovery had been conducted, the parties filed a notice of settlement stating that they had agreed "in principle" to settle Plaintiffs' claims on a class-wide basis.  The Named Plaintiffs from the New York and California actions joined to file the operative complaint in the Southern District of Florida, and, on February 8, Plaintiffs filed an unopposed motion for preliminary approval of the Settlement.  The district court referred further proceedings to a magistrate judge.

The Settlement Agreement covered a Rule 23(b)(2) and (b)(3) class of "[a]ll persons who purchased for personal consumption and not for resale, one or more of the Neuriva Products . . . between the dates of January 1, 2019 and the date of Preliminary Approval of the Settlement by the Court."  Class members who could provide proof of purchase would be able to recover up to $32.50 per claim, with a maximum of two claims, for a total potential recovery of $65.00.  Without proof of purchase, Class members could only recover $5.00 per claim, with a maximum of four claims, for a total potential recovery of $20.00.  The Settlement capped total recovery for the Class at $8 million.  If the submitted claims exceeded that amount, RB could either reduce the amount paid on each claim *pro rata*, or terminate the Settlement entirely.

The Settlement also provided injunctive relief to the Class in the form of required changes to Neuriva's labeling and marketing for a period of two years, starting six months after the Settlement became final.  The Settlement enjoined RB from using the terms "Clinically Proven," "Science Proved," "Clinically Tested

and Shown," "clinical studies have shown," or similar "shown" claims on Neuriva's labeling. But RB could still market Neuriva's ingredients as "Clinically Tested" and "clinically tested to help support brain health."

The Settlement Agreement also entitled six law firms representing the Plaintiffs to seek $2.9 million in attorneys' fees. RB agreed not to oppose Plaintiffs' fee request (often referred to as a "clear sailing" provision) and the parties agreed that, if the court awarded less than $2.9 million in fees, the remainder would revert to RB, rather than to the Class (a "kicker" provision). RB also agreed that it would support Plaintiffs' efforts to prove the value of the proposed injunctive relief to the court to win approval of the Settlement and their fee request.

Pursuant to the terms of the Settlement, Class members released all claims relating to misleading labeling and marketing of the Neuriva Products.

## C.

On April 23, 2021, the district court granted preliminary approval of the Settlement by entering a stipulated order that had been attached to an unopposed motion filed by Plaintiffs. The order "preliminarily certifie[d]" a nationwide settlement class of

> [a]ll persons who purchased for personal consumption and not for resale, one or more of the Neuriva Products (Neuriva Original, Neuriva Plus, or

> Neuriva De-Stress), from Defendants or
> an authorized reseller, in the United
> States, between the dates of January 1,
> 2019 and the date of Preliminary Ap-
> proval of the Settlement by the Court.

The district court concluded that "the class certification pre-requisites set forth in Federal Rule of Civil Procedure 23(a), (b)(3), and 23(b)(2)" had been met.

The preliminary approval order also appointed a third party, the Angeion Group, to act as the "Settlement Administrator," approved the parties' suggested plan of notifying Class members of the Settlement by placing advertisements on websites and social media apps, set a final fairness hearing for August 17, 2021, and set a deadline of July 27 for Class members to object to the terms of the Settlement or opt out.

One Class member, Frank, timely objected to the terms of the Settlement.[1]  Frank is the director of litigation at the Hamilton Lincoln Law Institute and a frequent objector to class-action settlements around the country.  Frank explained (in an accompanying declaration) that he was a member of the Class because he had

---

[1] An independent, non-profit advertising watchdog organization, Truth in Advertising, Inc. (TINA), also filed an *amicus curiae* brief in the district court raising many of the same points as Frank.

purchased a 30-count package of Neuriva Original from Amazon on February 2, 2021 for personal use for $21.95.

In his objection, Frank argued that the Settlement's purported $8 million benefit was "illusory" because the claims process was structured so that Class members were certain to receive only a fraction of that amount, and that the Settlement's injunctive relief was not targeted at Class members like him, who had purchased Neuriva Products in the past, and was worthless in any event. Because the Settlement's value had been artificially inflated, Frank contended that the $2.9 million in fees and costs sought by Class counsel was disproportionately large -- larger, in fact, than the total amount Class members would *actually* receive under the terms of the Settlement Agreement. Frank therefore contended that the Settlement must be disapproved based on Congress' 2018 amendments to Federal Rule of Civil Procedure 23 -- which require the district court to consider "the effectiveness of any proposed method of distributing relief to the class" and "the terms of any proposed award of attorney's fees, including timing of payment," when determining whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iii).

The magistrate judge held the final fairness hearing and, on December 15, 2021, issued a Report & Recommendation ("R&R") recommending that the district court approve the proposed Settlement and award the requested $2.9 million in attorneys' fees. At the time of the fairness hearing, Plaintiffs' counsel estimated that the total amount in claims submitted by Class members would be

between $1,049,797.50 and $1,181,225.00 -- or approximately 3x less than the amount requested by Plaintiffs' counsel for attorneys' fees and costs. Ultimately, Class members would submit 59,877 claims worth a total of $1,109,182.50.

The R&R never formally certified the Class that had previously been "preliminarily" certified. Relying primarily on cases decided before Congress' 2018 amendments to Rule 23, the R&R found that the Settlement's monetary relief was properly valued at $8 million -- the amount purportedly made available for Class members to claim. As for the injunctive relief, the R&R concluded that it had "some value," but did not assign a "specific dollar range" because doing so "would be speculative." Nevertheless, the R&R recognized that the injunctive relief played an integral role in the parties' Settlement, and that it must be considered alongside the Settlement's monetary relief to determine whether all parts of the Settlement Agreement together supported court approval. *See* R. & R. Regarding Class Action Settlement at 85 ("[C]ourts rightly consider the value of injunctive *and* monetary relief in assessing whether a class action settlement provides sufficient relief to the class." (emphasis in original)). After examining "the dollar amount of the settlement . . . through the prisms of potential recovery and the value of the injunctive relief," the R&R found that the Settlement as a whole constituted an "excellent" result for the Class and, therefore, that the Settlement was "fair, reasonable, and adequate" under Federal Rule of Civil Procedure 23(e)(2).

Frank objected to the R&R on December 29, 2021. On March 17, 2022, the district court overruled Frank's objection and, in a short order, adopted the R&R in full without additional analysis.

Frank's timely appeal followed.

## II.

Questions of the litigants' standing may be raised at any time, and are reviewed *de novo*. *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019). A district court's decision to approve a class-action settlement is reviewed for abuse of discretion. *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1251 n.2 (11th Cir. 2020); *Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1316 (11th Cir. 2013). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Chi. Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1309 (11th Cir. 2001). "An error of law is an abuse of discretion *per se*." *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1153 (11th Cir. 2019) (citation omitted).

## A.

We begin, as we must, with the issue of Frank's standing to bring this appeal. *See United States v. Amodeo*, 916 F.3d 967, 970 (11th Cir. 2019) ("On every writ of error or appeal, the first and

fundamental question is that of jurisdiction, *first*, of this court, and *then* of the court from which the record comes." (emphasis in original) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884))). The Named Plaintiffs argue that Frank lacks standing for two reasons: (1) he was not actually deceived by RB's marketing, and only purchased one of the Neuriva Products after he had already heard about the lawsuit, and thus has not suffered an "injury in fact" that is "concrete and particularized"; and (2) even if Frank could establish injury-in-fact, his supposed injuries would not be redressed by a favorable decision of this Court because the Settlement Agreement will provide Frank with a full refund for his purchase of one of the Neuriva Products, thus fully compensating him.

To start, we note that the Named Plaintiffs' "redressability" argument is better understood as another flavor of their injury-in-fact argument: because the Settlement Agreement will provide Frank with a full refund for his purchase, the Named Plaintiffs essentially contend that Frank cannot show that the district court's approval injured Frank in any way -- if anything, the Settlement made Frank better off by giving him his money back. Regardless of what label is applied, however, the Named Plaintiffs' arguments that Frank lacks standing because he was not actually deceived by RB's marketing or because the Settlement allows Frank to recover the purchase price of one of the Neuriva Products are clearly foreclosed by precedent. Frank has established that he is a member of

the Class who would be bound by the judgment, so he has standing.

"Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements": (1) "an 'injury in fact'"; (2) "a causal connection between the injury and the conduct complained of'; and (3) "[a likelihood] that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). In *Devlin v. Scardelletti*, the Supreme Court held that nonnamed class members "who have objected in a timely manner to approval of the settlement at the fairness hearing" have "an interest in the settlement that creates a 'case or controversy' sufficient to satisfy the constitutional requirements of injury, causation, and redressability," and thus "have the power to bring an appeal without first intervening." 536 U.S. 1, 6-7, 14 (2002) (quoting *Lujan*, 504 U.S. at 555). In other words, an objector's status as a member of the class who is bound by the district court's judgment is itself enough to provide him or her with standing to appeal the district court's approval of a class-wide settlement over his or her objection. *See id.* "Otherwise, class members would be deprived of 'the power to preserve their own interests in a settlement that will ultimately bind them, despite their expressed objections before the trial court.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1260-61 n.7 (11th Cir. 2021) (quoting *Devlin*, 536 U.S. at 10) (holding that nonnamed class members who objected to district court approval of class-action settlement and who had not opted out had Article

III standing to appeal approval), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021), *and cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765 (2022).

The Named Plaintiffs do not dispute that Frank is a member of the Settlement Class -- nor could they. The Settlement defines the relevant Class as "[a]ll persons who purchased for personal consumption and not for resale, one or more of the Neuriva Products, from [RB] or an authorized reseller, in the United States, between the dates of January 1, 2019 and the date of Preliminary Approval of the Settlement by the Court." In voluminous affidavits filed with the district court, Frank explained that he purchased a 30-count bottle of Neuriva Original from Amazon for personal use for $21.95 prior to the date of preliminary approval of the Settlement, on February 2, 2021. By definition, the Settlement does not impose any requirement that a purchaser have actually or subjectively been deceived upon purchasing Neuriva products to be a member of the Class. So Frank is a "member of the [C]lass bound by the judgment," regardless of whether he was actually deceived by RB's advertising. *Devlin*, 536 U.S. at 7; *Berni v. Barilla S.p.A.*, 964 F.3d 141, 145-46 (2d Cir. 2020) (citing *Devlin*, 536 U.S. at 6-7) (holding that objector to approval of class settlement for deceptive advertising claims had standing to appeal because he was a member of the class despite admitting that he was not deceived by defendant's packaging).

Frank was injured by the district court's approval of the Settlement because the Settlement releases any potential claims he has

against RB based on misleading labeling of the Neuriva Products. Thus, he will be precluded from seeking other forms of relief, such as those that were sought in the operative complaint but not included in the Settlement Agreement (*e.g.*, pre- and post-judgment interest). And a favorable resolution of this appeal would obviously provide Frank with relief by vacating the district court's approval of the Settlement Agreement. *See Berni*, 964 F.3d at 145-46 ("Once he established that he was a member of the class, he needed to do no more in order to proceed with his objection. For the same reason, he need do no more now to proceed with his appeal before this Court."). Frank has standing to pursue this appeal.

## B.

We turn now to the principal issue raised by this appeal: whether the district court abused its discretion when it approved the parties' Settlement Agreement as "fair, reasonable, and adequate" under Federal Rule of Civil Procedure 23(e)(2). Frank argues that the district court erred by overestimating the value of the Settlement's monetary and injunctive relief to Class members, thereby approving an Agreement that awarded a disproportionately high amount in attorneys' fees and costs at the expense of the Class.

We agree that the district court's assessment of whether the Settlement was fair, reasonable, and adequate was flawed, but for a different and more basic reason. The Named Plaintiffs have failed to allege any continuing or "imminent" harm in connection with their past purchases of the Neuriva Products; thus, they lack standing to pursue the injunctive relief awarded by the Settlement, and the district court lacked the power to grant that relief. The upshot of this jurisdictional defect is that the district court's approval order must be set aside: because the value of the Settlement's injunctive relief formed an integral part of the district court's calculus of its overall fairness, the court's approval of the Settlement was premised on a legal error and, as a result, was necessarily an abuse of discretion.

### 1.

Article III limits federal courts to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2.  Consequently, a plaintiff must demonstrate that he or she has "[s]tanding to sue," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), "throughout all stages of litigation," *Amodeo*, 916 F.3d at 971 (citation omitted).  This generally means that the plaintiff must satisfy the three well-established requirements discussed above: injury-in-fact, causation, and redressability.  *See Lujan*, 504 U.S. at 560-61.  And "because injunctions regulate future conduct, a party has standing to seek injunctive relief" only if his injury in fact is "a real and immediate -- as opposed to a merely conjectural or hypothetical -- threat of *future* injury." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (emphasis in original) (alteration adopted) (citation omitted).

This is true even if a plaintiff also seeks monetary relief for past harm.  As the Supreme Court has held, "a plaintiff must 'demonstrate standing separately for each form of relief sought.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) (quoting *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 185 (2000)).  Thus, even if a plaintiff can establish standing to pursue separate claims for monetary relief based on allegations of *past* harm, before a court may grant that plaintiff injunctive relief, the plaintiff must separately establish a threat of "real and immediate," as opposed to "conjectural or hypothetical," future injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 105 (1983); *cf. also TransUnion*, 141 S. Ct. at 2210 ("[A] plaintiff's standing to seek injunctive relief does not

necessarily mean that the plaintiff has standing to seek retrospective damages.").

These principles apply with no less force in the class-action context. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (quotation marks and citation omitted)). "Thus, it is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

Here, the district court did not assure itself of the Named Plaintiffs' standing to seek injunctive relief before approving the parties' Settlement Agreement, a requirement that it was obliged to satisfy before finally signing off on the case. *See Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) (holding that federal courts' "obligation to assure [them]selves of litigants' standing under Article III. . . . extends to court approval of proposed class action settlements."). Though Frank has not raised this issue on appeal, the obligation to ensure that the Named Plaintiffs had standing in the district court remains in this Court. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("[I]t is well settled that a federal court

is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking. . . . [A]n appellate federal court must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review." (quotation marks and citation omitted)).

It is apparent that the Named Plaintiffs lack Article III standing to pursue their claims against RB for injunctive relief. The movant's burden of proof at the class-certification stage is unclear. *See* 1 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 7:21 (6th ed. 2022). For purposes of this appeal, we assume without deciding that the applicable standard is a pleading standard. *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to establish standing], for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." (second alteration in original) (quotation marks and citation omitted)). The Named Plaintiffs fail to satisfy even that low burden. The complaint alleges only *past* harm as a result of RB's misrepresentations; the Named Plaintiffs allege that they purchased Neuriva Products because they saw RB's misleading representations regarding the Neuriva Products and their ingredients, and suffered economic injury as a result. But "[t]he fact that [the Named Plaintiffs] may have been injured by [RB's misleading statements and omissions] in the past . . . cannot be sufficient to establish an injury in fact that would support injunctive relief." *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248,

1271-72 (11th Cir. 2015). The Named Plaintiffs also must allege some "lasting impact or likely future injury." *Id.* at 1272. On this front, all the Named Plaintiffs offer is an allegation that they "would like to purchase Defendants' products if they truly improved brain performance," but are "unable to rely on Defendants' representations regarding the effectiveness of Defendants' products in deciding whether to purchase Defendants' products in the future." This is plainly insufficient to establish a threat of imminent or actual harm.

We need look no further than the Supreme Court's seminal decision in *Lujan* to see why. There, a group of environmental organizations challenged a Department of the Interior regulation that interpreted certain provisions of the Endangered Species Act to apply only to government actions taken domestically or on the high seas. 504 U.S. at 558-59. On summary judgment, the plaintiffs attempted to establish their standing to seek injunctive relief by submitting affidavits from several of their members stating that the agency's rule would harm them prospectively because it would "increas[e] the rate of extinction of endangered and threatened species" that those members hoped to one day see. *Id.* at 562-63. For instance, one member stated that she had previously observed the habitat of the endangered Nile crocodile in Egypt, and that she "intend[ed] to do so again, and hope[d] to observe the crocodile directly." *Id.* at 563. Another member said in an affidavit and again at deposition that she had previously observed an endangered species habitat in Sri Lanka, and that she "intend[ed] to return to Sri

Lanka in the future" and "hope[d]" to spot the species then, but had no current plans to return. *Id.* at 563-64.

The Supreme Court held that the plaintiffs' averments were insufficient to confer on them standing because they "contain[ed] no facts . . . showing how damage to the species will produce 'imminent' injury to [the plaintiffs]." *Id.* at 564. The Court explained that the affiants' past visits to species' habitats were not enough because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *Lyons*, 461 U.S. at 102). And the members' "profession of an 'intent' to return to the places they had visited before" was insufficient because "[s]uch 'some day' intentions -- without any description of concrete plans, or indeed even any specification of *when* the some day will be -- do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* (emphasis in original) (cleaned up).

The same is true in this case. The allegations that the Named Plaintiffs previously purchased Neuriva Products do not "in [themselves] show a present case or controversy regarding injunctive relief," and the complaint does not allege any "continuing, present adverse effects" associated with prior purchases of the Neuriva Products. *Id.* Nor do the Named Plaintiffs provide "any description of concrete plans" to purchase the Neuriva Products again in the future. *Id.* Allegations that the Named Plaintiffs "would like" to purchase RB's products at some undefined point in the

future, much like the *Lujan* affiants' statements that they "intend[ed]" to return to the species' habitats or "hope[d]" to spot the species themselves someday, without more, "do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*

If anything, this case presents an even more remote and attenuated risk of future harm than in *Lujan*, because none of the Named Plaintiffs have even alleged that they intend to buy the Neuriva Products again. The Named Plaintiffs only state that they "would like" to purchase products from RB "if" RB develops products that "truly improve[] brain performance." The conditional nature of their allegations compels the conclusion: any alleged harm to the Named Plaintiffs is "conjectural [and] hypothetical," not "actual or imminent," as Article III demands. *Id.* at 560. Indeed, the operative complaint provides every reason to *doubt* that the Named Plaintiffs will ever purchase the Neuriva Products again. *See Berni*, 964 F.3d at 147-48 (holding that past purchaser of deceptively advertised boxes of pasta lacked standing to pursue injunctive relief on behalf of a class because "there is no reason to believe that all, or even most, of the class members -- having suffered the harm alleged -- will choose to buy [the product] in the future"). As the Named Plaintiffs themselves allege, the Neuriva Products as currently constituted are "worthless," and scientific evidence has shown that "it is biochemically impossible for the ingredients [in the Neuriva Products] to improve brain performance." And the Named Plaintiffs never allege if or when RB will be able to produce any products that actually improve brain performance in line with

their expectations. The only products that the Named Plaintiffs arguably express any interest in purchasing are products that do not yet exist, and may never exist -- a plainly insufficient expression of future harm to confer Article III standing. *See Duty Free Ams.*, 797 F.3d at 1272 (holding that duty free store's claim that it would suffer injury if it resumed purchasing products from a vendor that allegedly imposed anticompetitive display space and inventory restrictions as a precondition to purchase did not establish standing to pursue injunctive relief because plans to possibly purchase products in the future could not "be characterized as a 'concrete' or 'actual' injury in fact because, by its very terms, it has not yet occurred, and indeed may never occur"). The Named Plaintiffs therefore lack Article III standing to pursue prospective injunctive relief against RB.

Trying to resist this conclusion, the Named Plaintiffs invoke *Davidson v. Kimberly-Clark Corp.*, a case where the Ninth Circuit held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase." 889 F.3d 956, 969 (9th Cir. 2018). That case was also a putative consumer class action, brought by a named plaintiff who had purchased baby wipes. *Id.* at 961. The named plaintiff alleged that the defendant had falsely advertised that the wipes would be "flushable," and sought injunctive relief requiring changes in the defendant's marketing. *Id.* The Ninth Circuit concluded that the plaintiff had standing to seek

injunctive relief because she had "adequately alleged that she faces an imminent or actual threat of future harm caused by Kimberly-Clark's allegedly false advertising," pointing to allegations that the plaintiff "continues to desire to purchase wipes that are suitable for disposal in a household toilet," and "would purchase truly flushable wipes manufactured by [Kimberly-Clark] if it were possible." *Id.* at 970-71. The court reasoned that these allegations demonstrated harm in the form of an informational injury -- the plaintiff's "inability to rely on the validity of the information advertised on Kimberly-Clark's wipes despite her desire to purchase truly flushable wipes." *Id.* at 971.

We remain unpersuaded. The Ninth Circuit's reasoning rests on an assumption that the plaintiff will, in fact, try to purchase the defendant's products again in the future, at which point the plaintiff will again be deceived by the defendant's advertising, or at least doubt its veracity. *See id.* at 970. But, in this case, as we've described, the Named Plaintiffs' complaint provides us with no basis to conclude that they have "actual or imminent" plans to purchase RB's products again. Quite the opposite: all indications are that the Named Plaintiffs will not purchase the Neuriva Products again, given the plethora of false statements allegedly made in RB's advertising and the purportedly "worthless" nature of the Products. *See Berni*, 964 F.3d at 147-48. Because the Named Plaintiffs do not allege when, if ever, RB might produce a product they would be interested in purchasing, their allegations are exactly the sort of "'some day' intentions . . . without any description of

concrete plans" that the Supreme Court has instructed are insufficient to confer Article III standing. *See Lujan*, 504 U.S. at 564.

Thus, the Named Plaintiffs lack standing; the district court was without jurisdiction to grant their requested injunctive relief against RB; and, as a result, the district court's order approving the Settlement Agreement must be vacated. *See Frank*, 139 S. Ct. at 1046. This is because, as the magistrate judge himself properly recognized in his R&R, the decision whether to approve a class-action settlement is a holistic one; the various parts of a settlement must be considered in concert to determine whether the Settlement *as a whole* provides relief to the Class that is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also Brooks v. Ga. State Bd. of Elections*, 59 F.3d 1114, 1119-20 (11th Cir. 1995) ("We are not free to delete, modify or substitute certain provisions of the settlement. The settlement must stand or fall as a whole." (citation omitted)). In other words, the district court's determination that the Settlement's injunctive relief would provide value to the class was inextricably bound up with its determination that the Settlement in its entirety was fair, reasonable, and adequate. Because the district court lacked the power to grant this injunctive relief, its determination was based on a legal error, and must be set aside as an abuse of discretion. *See Managed Care*, 939 F.3d at 1153.

## 2.

In a filing submitted after oral argument, Frank urges us to bypass this jurisdictional inquiry, claiming that, even if the Named Plaintiffs lack standing to pursue injunctive relief, we need not

vacate the district court's approval of the Settlement Agreement on that ground because "the Court still has appellate jurisdiction over the complaint as a whole because of the damages claims," and "[a] class settlement may include relief that plaintiffs could not win at trial." But, as we see it, neither of these contentions is convincing.

First, a plaintiff's standing to pursue claims for damages does not by itself confer the district court with jurisdiction "over the complaint as a whole." As we've noted already, the Supreme Court has instructed us that federal courts are to assess a plaintiff's standing -- and, by extension, their jurisdiction -- "separately for each form of relief sought." *TransUnion*, 141 S. Ct. at 2210 (citation omitted); *see also id.* at 2214 (reversing judgment affirming relief for plaintiffs because plaintiffs lacked standing to obtain some, but not all, of the relief granted); *see also Frank*, 139 S. Ct. at 1046 ("[F]ederal courts lack jurisdiction if no named plaintiff has standing.").

Second, to the extent Frank suggests that the district court did not need jurisdiction to approve a settlement agreement that contained injunctive relief, that argument falls short as well. Citing *Local No. 93, International Association of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986), Frank says that "[a] class settlement may include relief that plaintiffs could not win at trial." But this reliance on *Firefighters* elides an important distinction between a court's *jurisdiction* to entertain a claim or to grant relief, and a plaintiff's substantive *right* to relief under the particular statute that forms the basis of his or her claim.

*Firefighters* involved the district court's approval of a consent decree between the City of Cleveland and a class of Black and Hispanic firefighters who were already employed with the City or who would apply to be hired by the City in the future, to resolve a Title VII suit alleging that the City had discriminated against minority firefighters in hiring and work assignments on the basis of their race and national origin.  478 U.S. at 504, 509-10.  As part of the consent decree, the City agreed to use "race-conscious" designations in its hiring and promotion practices to ensure a minimum number of minority firefighters would be hired for or promoted to certain positions.  *Id.*  The firefighters' union objected, arguing that the consent decree should not be approved because it would benefit individuals who had not themselves actually been victims of the City's discriminatory practices.  According to the union, this would run contrary to § 706(g) of Title VII's prohibition against entry of an "order of the court" requiring "hiring, reinstatement, or promotion" of an individual who had been denied employment or advancement "for any reason other than discrimination on account of race, color, religion, sex, or national origin."  *Id.* at 513-14 (emphasis omitted) (quoting 42 U.S.C. § 2000e–5(g)).

The Supreme Court disagreed with the union and affirmed the district court's approval of the consent decree.  *Id.* at 525.  Even if § 706(g) would have prevented the plaintiff class from obtaining the relief contained in the consent decree *following a trial*, the Court held that the statute did not prohibit the district court from granting the relief as part of a *consent decree* because § 706(g)

speaks only of "order[s] of the court," and "consent decrees are not included among the 'orders' referred to in [the statute]." *Id.* at 521. Crucially for our purposes, *Firefighter*'s holding was limited to an interpretation of the statutory language of Title VII, *id.* at 513-14 n.5; nowhere did the Court purport to authorize district courts to enter consent decrees or approve class-action settlements that provide relief that the district court lacks the power to grant. To the contrary, the Court expressly noted that "a consent decree must spring from and serve to resolve a dispute *within the court's subject-matter jurisdiction*," *id.* at 525 (emphasis added), and reiterated that district courts are only empowered to enter a consent decree "to the extent that [it] is not otherwise shown to be unlawful," *id.* at 526. *Firefighters* thus has no bearing on a district court's "obligat[ion] to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking," *Univ. of S. Ala.*, 168 F.3d at 410, which, again, "extends to court approval of proposed class action settlements." *Frank*, 139 S. Ct. at 1046; *see also Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

Accordingly, we are required to vacate the district court's approval of the Settlement Agreement and remand this case to the district court for further proceedings, including analysis of whether any settlement agreement entered into by the parties is "fair, reasonable, and adequate" under Federal Rule of Civil Procedure

23(e)(2). Whatever value the Settlement's injunctive relief provided, it may no longer be part of the district court's calculus -- on remand, the court should account only for relief that the Named Plaintiffs have standing to pursue and that it has jurisdiction to grant when assessing the overall fairness of any settlement (assuming, of course, that the parties reach a new settlement agreement and submit it for the district court's approval).

## C.

We observe that several other considerations will be relevant to the district court on remand. We highlight three such concerns.

First, it remains our law that at least one class representative must establish that he or she has Article III standing to represent each claim brought on behalf of a class (or subclass) by showing that he or she has "suffer[ed] the same injury as the class members." *See Prado-Steiman*, 221 F.3d at 1279 (citation omitted). While this issue overlaps in some ways with the requirements of commonality, typicality, and adequacy set forth in Federal Rule of Civil Procedure 23(a), the issues are quite distinct. *See* Rubenstein, *supra*, at § 2:6 ("The concepts of standing and Rule 23(a) therefore appear related as they both aim to measure whether the proper party is before the court to tender the issues for litigation. But they are in fact independent criteria. They spring from different sources and serve different functions."). The standing requirement arises, of course, from Article III's command that federal courts resolve only "Cases" or "Controversies," and ensures that a plaintiff has "such a

personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues[.]" *Baker v. Carr*, 369 U.S. 186, 204 (1962). By extension, then, the requirement that at least one class representative have standing to raise each class claim or subclaim by showing that he or she has suffered "the same injury" ensures that the named plaintiffs possess the requisite interest in litigating all the absent class members' claims. *See Prado-Steiman*, 221 F.3d at 1279 ("[W]e have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). This requirement must be satisfied before final judgment is entered in the form of an approval of a class-action settlement. *Frank*, 139 S. Ct. at 1046.

In *Prado-Steiman*, we considered an appeal from a district court's order granting class certification to a broad class of developmentally disabled individuals who had allegedly been deprived of benefits to which they were entitled under Florida's Home and Community Based Waiver (HCBW) program. 221 F.3d at 1280. We agreed with the defendants that the district court had abused its discretion in granting class certification because it had failed to resolve whether "at least one named representative of each class or subclass ha[d] standing for each proffered class or subclass claim." *Id.* We also observed that because the class members had not all been injured by the same violative conduct, or "bad act[s]," on the part of the defendants, the "alleged injuries may be better

addressed through several subclasses rather than one large class." *Id.* at 1280-81. The complaint alleged that the defendants had failed to provide some class members with approved services in a reasonably prompt manner, while allegedly denying other class members' claims without due process, and, for still other class members, the defendants had allegedly failed to adjudicate claims applications in a reasonably prompt manner. *Id.* at 1281-82. Because it was not clear whether any named plaintiff had individual standing to bring each of the class or subclass claims, we remanded for the district court to resolve fact-specific questions on that issue. *Id.* at 1280.

In *Fox v. Ritz-Carlton Hotel Co.*, by contrast, we held that a named plaintiff had "class representative standing" to assert claims on behalf of a class of persons who had dined at Ritz-Carlton restaurants across Florida, because his alleged injuries and those of the absent class members were identical. 977 F.3d 1039, 1047 (11th Cir. 2020). The named plaintiff had eaten at three Ritz-Carlton restaurants all located at the hotel's Key Biscayne location, and alleged that, each time, the hotel had illegally charged him an automatic gratuity and sales tax without sufficiently warning him of the charges on the menus or on the faces of the bills, in violation of Florida law. *Id.* at 1043-44. Though the named plaintiff had not visited any other Ritz-Carlton locations in Florida, he sought to represent a class of individuals who had dined at all of its 49 restaurants throughout the state. *Id.* We concluded that the named plaintiff had standing to raise the absent class members' claims because he had adequately alleged that Ritz-Carlton employed the

same deceptive practices at each of its restaurants (*i.e.*, it failed to warn customers of the extra charges on the menu or the bill in the same manner), and, thus, he and the absent class members had suffered the "same economic injury." *Id.* at 1047. It didn't matter that he and the absent class members had suffered those injuries "on different days at different restaurants." *Id.*; *see also Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1302, 1307 (11th Cir. 2008) (holding that victims of Hurricane Frances had class representative standing to represent victims of other hurricanes that had hit Florida that year in suit against insurance company for breach of contract because the absent class members' claims were "identical" to those brought by the named plaintiffs).

Here, there is some question as to whether any Named Plaintiff has standing to raise certain claims of misrepresentations regarding *one* of the three Neuriva Products: Neuriva De-Stress. None of the Named Plaintiffs alleges that he or she purchased this Product. It is true that some of RB's alleged falsehoods and misrepresentations are common to all three Neuriva Products, and the Named Plaintiffs may well have standing to assert claims based on those misrepresentations on behalf of all absent class members -- even those who only purchased Neuriva De-Stress. After all, claims of injury that are based on the same misrepresentations target the same conduct by RB, and the "injury suffered" will be identical. *Prado-Steiman*, 221 F.3d at 1281; *see also Fox*, 977 F.3d at 1047. Thus, for example, the Named Plaintiffs charge that RB falsely advertises that coffee cherry extract -- an ingredient

common to all three Neuriva Products -- has been "clinically proven to increase levels of the vital neuroprotein BDNF, known to strengthen connections between brain cells."

Other claims, however, are based on alleged misrepresentations that only apply to Neuriva De-Stress. The complaint alleges, for instance, that RB claims that Neuriva De-Stress has been proven to benefit "stress reduction" and "relaxation" -- benefits RB does not claim for Neuriva Original or Neuriva Plus -- and that one of the active ingredients unique to Neuriva De-Stress -- Melon Concentrate -- "is a common source of the potent antioxidant SOD (SuperOxide Dismutase) that is naturally found in the body to fight oxidative stress." The Named Plaintiffs may not have standing to raise these claims because they may not have suffered the same injury related to these alleged misrepresentations as absent class members who purchased Neuriva De-Stress. *See Prado-Steiman*, 221 F.3d at 1281. The district court should work its way through these issues on remand to ensure that at least one Named Plaintiff has standing to assert each claim or subclaim on behalf of the class prior to approving any class-wide settlement or granting class certification. *See id.* at 1279.

Which brings us to a second point: on remand, the district court should determine whether to certify a class and, if so, enter an appropriate certification order before deciding whether to approve class-wide relief. *See* Fed. R. Civ. P. 23(a)-(c), (e). The closest the district court came to certifying a class in this case was to "preliminarily" certify a class for the purposes of settlement in its

preliminary approval order. Conducting a meaningful analysis of whether a specifically defined class or subclass meets Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation, as well as Rule 23(b)(3)'s predominance and superiority requirements, will ensure that "the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Prado-Steiman*, 221 F.3d at 1279 (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)); *see also* Rubenstein, *supra*, at § 3:29. Given the disparate nature of some of the claimed misrepresentations regarding Neuriva De-Stress and the other Neuriva Products, it may be helpful to divide any eventually certified class into different subclasses based on the content of the misrepresentations by which different class representatives -- and any corresponding class members -- claim to have been injured. *See Prado-Steiman*, 221 F.3d at 1280-81 (noting that the "disparate" injuries suffered by different class members "may be better addressed through several subclasses rather than one large class"). We "leave the ultimate decision as to what kinds of appropriate subclasses to create [, if any,] to the sound discretion of the district court." *Id.* at 1282.

Finally, the district court should be sure to consider the points raised by Frank in this appeal when considering whether any settlement agreement is "fair, reasonable, and adequate" under Rule 23(e)(2). *See* Br. for Appellant at 14-37. Thus, the district court should consider the impact of Congress' 2018 amendments

to Rule 23(e)(2)(C) on its analysis of the fairness of a class-action settlement, including "the effectiveness" of the settlement's "method of distributing relief to the class," Fed. R. Civ. P. 23(e)(2)(C)(ii), and whether the proposed attorneys' fees are disproportionately large compared to the amount of relief reasonably expected to be provided to the class. *See, e.g., Briseño v. Henderson*, 998 F.3d 1014, 1026-27 (9th Cir. 2021) (holding that class settlement was not "fair, reasonable, and adequate" because 2018 amendments to Rule 23 require courts to "scrutiniz[e] the fee arrangement for potential collusion or unfairness to the class," and settlement at issue gave plaintiffs' counsel a disproportionate distribution of the settlement, the parties agreed to a "clear sailing arrangement," and the agreement contained a "'kicker' or 'reverter' clause"); *cf. also Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (reversing approval of class-action settlement that provided "a meager recovery for the class but generous compensation for the lawyers" because it "s[old] out the class," prior to 2018 amendments).

In short, we vacate the Settlement approval by the district court and remand the case for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**